RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0362p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

DONNA REID (09-5142), WAYNE REID
(09-5144),

  *Defendants-Appellants.*

Nos. 09-5142/5144

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
Nos. 07-00110-001; 07-00110-002—Danny C. Reeves, District Judge.

Argued: October 21, 2010

Decided and Filed: November 30, 2010

Before: GUY and GRIFFIN, Circuit Judges; BARZILAY, Judge.[*]

_____

## COUNSEL

**ARGUED:** Lowell W. Lundy, Pineville, Kentucky, William G. Crabtree, CRABTREE & GOFORTH, PLLC, London, Kentucky, for Appellants. James E. Arehart, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee. **ON BRIEF:** Lowell W. Lundy, Pineville, Kentucky, William G. Crabtree, CRABTREE & GOFORTH, PLLC, London, Kentucky, for Appellants. Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, Stephen C. Smith, ASSISTANT UNITED STATES ATTORNEY, London, Kentucky, for Appellee.

_____

## OPINION

_____

RALPH B. GUY, JR., Circuit Judge. Defendants Wayne Reid and Donna Reid, husband and wife, were convicted following a jury trial of conspiracy to commit money

_____

[*] The Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

laundering, 18 U.S.C. § 1956(h); six counts of money laundering, or aiding and abetting money laundering, 18 U.S.C. § 1956(a)(1)(A)(i), (a)(1)(B)(i); and one count of harboring or concealing a fugitive, 18 U.S.C. § 1071.  The jury also returned a separate verdict for forfeiture of $800,000, 18 U.S.C. § 982(a)(1).  Both defendants argue for a new trial on the grounds that the prosecutor improperly vouched for several witnesses and that the district court erred by limiting the cross-examination of two prosecution witnesses concerning their adulterous relationship.   In addition, while Wayne Reid claims error in the limitation placed on the character evidence he offered, Donna Reid contends that the district court improperly excluded evidence that she was charged in an attempt to pressure her husband to plead guilty.  After review of the record and consideration of the arguments presented on appeal, we affirm.

## I.

The evidence adduced during the defendants' ten-day trial established the existence of a large-scale, mostly marijuana, drug trafficking operation centered in rural Clay County, Kentucky.  That operation generated millions of dollars in illicit drug proceeds for its distributors, one of whom, Larry Jackson, Jr., (Jackson) was a long-time friend of Wayne and Donna Reid.[1]  The money laundering conspiracy began in January 2000, after the drug trafficking operation was well established, and continued until the last of the substantive money laundering transactions occurred on November 9, 2005. In all, Reid received an estimated $1.5 million in drug proceeds from Jackson either directly, or at Jackson's direction after he became a fugitive.  Since defendants do not challenge the sufficiency of the evidence, we briefly summarize the relevant drug trafficking and money laundering activities.

Larry Jackson, who was on disability for a coal mining injury, became involved in a drug trafficking operation run by Kenneth Day (Day) and was asked to take over the operation while Day served four years in prison between 1997 and 2002.  Introduced to Day's suppliers, including John Sherry (Sherry), a/k/a Terry King, Jackson increased the quantities of marijuana being distributed from a few hundred pounds per month to, at its

---

[1]For ease of reference, Wayne Reid will be referred to as Reid and Donna Reid by her full name.

height, a few thousand pounds every three to four months. Eugene Stewart (Stewart) was a customer and then became Jackson's partner in the marijuana distribution.

In January 2000, at the commencement of the money laundering conspiracy, Jackson was living in a trailer behind the Reids' home. At that time, Reid, who had previously worked operating heavy equipment and running a store and an auction business, was the pastor of a local Baptist church and a partner with his brother-in-law Darrell McQueen (McQueen) in an excavation business. Donna Reid had retired after ten years of teaching to open a church-affiliated temporary foster care home in 2000. Around that time, Reid offered to sell their house, the trailer, and the surrounding property to Jackson. When Jackson told Reid that he could not "show" that much money, Reid offered to keep the property in his name. Jackson paid Reid $125,000 in cash toward the total purchase price of $175,000, and title remained in the Reids' name.

Not long after, Reid approached Jackson about joining the excavation business as a "silent" partner by providing money to purchase equipment in exchange for a share of the profits in the future. Jackson testified, as did Stewart and Day, that Reid knew that they were selling drugs. Jackson even testified that he "laid it all out" for Reid, and promised to "keep Reid out of it" if Reid promised not to lie or cheat him. Jackson testified that he gave Reid a total of $150,000 in cash in late March and early April 2000. Reid used the money to purchase some equipment, including a Freightliner truck for $41,000.

Then, in May 2000, Reid invited Jackson to become a silent partner in the purchase and development of a 250-acre farm. Jackson testified that he accepted, gave Reid $335,000 in cash, and understood that he would "get a check" that would be attributable to legitimate business activity. The property, which would be called Deer Creek Estates, was purchased at public auction by the Reids and McQueens with a $225,000 mortgage. Bank records showed that between March 2000 and November 2000, frequent if not daily deposits of cash totaling nearly $475,000 were made into the Reids' personal and business accounts. Yet, not one of those deposits exceeded $10,000.

Development of that property over the next few years included removing timber and coal, constructing the Deer Creek Quick Stop, remodeling an existing home on the property, and building several new homes. Jackson testified that he gave Reid $80,000 or $90,000 in cash toward the construction of the Quick Stop, gave Reid roughly $90,000 in cash to remodel the existing home on the property, and instructed Stewart to deliver another $75,000 in cash to Reid for the completion of a home being built for the Reids' daughter Marty and her husband at the time, Shawn Hensley. There was also evidence that Reid paid more than $100,000 in cash for building supplies during the years 2000 to 2002. Reid asserted that the documented influx of cash came from legitimate sources of income, including the sale of timber and coal and some excavation and gravel work, but it was largely unsubstantiated.

In January 2002, before Jackson was indicted, the Reids, d/b/a Reid Gravel, took a bank loan for $1 million.[2] Reid purchased nearly $725,000 in heavy equipment, paid off an existing Deer Creek mortgage, and deposited the rest of the money into the bank. Reid approached Stewart and Day about joining this expansion, but they declined. Jackson, however, agreed and had Stewart deliver cash to Reid for several loan payments and other expenses.

Jackson was finally indicted in February 2002, but he eluded arrest and was declared a fugitive in April 2002. Jackson fled to Tucson, Arizona, where he stayed briefly with Sherry, took on another identity, and maintained contact with Stewart and Reid using prepaid phones and making a few return trips to nearby Tennessee. Stewart took over managing the marijuana operation, held drug proceeds belonging to himself and Jackson, and delivered cash to Reid at Jackson's direction until it ran out. Stewart was arrested with $75,000 in cash in May 2002, but successfully challenged the validity of the stop and ceased his drug trafficking activities by early 2003. The Reids admitted that Jackson arrived at their home in February 2005, in need of money and not physically well, and returned to Arizona with $50,000 in cash from a bank loan they took out against the land they were holding for Jackson.

---

[2]McQueen was unwilling to take on such debt, which led to the dissolution of their partnership.

Day, Stewart, Sherry, and finally Jackson were apprehended between April and September 2005. All four pleaded guilty under agreements that authorized reductions in sentence for providing substantial assistance to the government. Within days of Jackson's arrest on September 15, 2005, more than 100 acres of land, two homes, and a certificate of deposit for $100,000 were transferred from Wayne and Donna Reid to Donna Reid only. The defense argued that these transfers were well-intentioned efforts at estate planning, which were prompted by the heart attacks and bypass surgery Reid had during 2004.

The continued investigation of the Reids finally led to the return of a five-count indictment against Wayne Reid in December 2007, and later to the return of a nine-count second superceding indictment against both Wayne and Donna Reid in June 2008. At the conclusion of trial, conducted over ten days in September 2008, the jury found the defendants guilty of conspiracy to commit money laundering, harboring or concealing a fugitive, and all six counts of money laundering, or aiding and abetting money laundering.[3] The district court sentenced Wayne Reid to a total of 194 months' imprisonment, and sentenced Donna Reid to a total of 188 months' imprisonment. Each defendant filed a timely notice of appeal.

## II.

### A.      Prosecutorial Vouching

Under this court's familiar two-step inquiry for evaluating prosecutorial misconduct, we determine first whether the conduct or remark was improper. *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999). If it was improper, we must determine whether the impropriety was sufficiently flagrant to warrant reversal taking into account four factors: (1) the degree to which the conduct or remarks tended to

---

[3]The substantive money laundering charges were based on transactions involving the proceeds of illegal activity, including: the sale of the Quick Stop for $160,000 in December 2003 (count 2); the sale of heavy equipment to pay off the balance of the $1 million loan in October 2004 (count 3); the use of the proceeds of the insurance on the remodeled home that was destroyed by fire to open two $100,000 certificates of deposit (CDs) in February 2005 (count 5); and the sale of the Freightliner truck at auction and use of the proceeds to purchase a $50,000 CD in November 2005 (count 7). In addition, money laundering charges arose out of the $50,000 loan taken to provide cash to Jackson in February 2005, and the payoff of that loan with money withdrawn from one of the $100,000 CDs in August 2005 (counts 4 & 6).

mislead the jury or prejudice the defendant; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally put before the jury; and (4) the overall strength of the evidence against the defendant. *Id*. at 549-50. Whether a prosecutor's conduct or statements constitute misconduct or render a trial fundamentally unfair are mixed questions of law and fact, which we review *de novo*. *Id.* at 549.

### 1.      Cooperating Witnesses

"Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness." *Id.* at 550. This generally involves either blunt comments asserting personal belief, or comments that imply special knowledge of facts not before the jury or the credibility or truthfulness of the witness. *Id*. Defendants claim the prosecutor improperly vouched for the credibility of Day, Jackson, Sherry, and Stewart—in the order that they testified—by eliciting testimony regarding, and arguing in closing about the cooperation provisions of their plea agreements and the consequences they would face if they testified falsely.

Specifically, each of the cooperating witnesses testified in very similar terms that he had agreed as part of his plea to testify truthfully if called as a witness; that his truthful testimony could result in the filing of a motion for reduction of sentence; that the determination of whether to reduce his sentence would be made by the judge; and that he would lose the chance for a reduction in sentence and would face additional perjury charges if he testified falsely. Defense counsel objected repeatedly during this questioning of Day, the first of the cooperating witnesses to testify, but the objection was overruled and counsel did not repeat the objection when the same questions were asked of the other three cooperating witnesses. Further, in the context of discussing the credibility of the cooperating witnesses, the prosecutor made the following comments in his rebuttal closing argument:

> No, I'm not asking you to take these four drug dealers to dinner. I wouldn't ask your daughter or your son to marry either one of these men. What I'm asking you to make is a fair determination of who told

the truth when they took the oath and they took this witness stand, and that's where you make your decision.

You make your decision on what was put before you in that witness stand when they raised their hand and made their oath *and they swore to you under the penalty of perjury.*  And, yes, they did enter plea agreements *and, yes, they are required to cooperate and, yes, they are required to tell the truth.  And if they do not tell the truth, every one of them acknowledge that they're going to get more time and they'll get absolutely no time off of their sentence.  And every one of them acknowledge that the person who will decide whether they get a day off or not is this Judge that sits over this trial.*

(Emphasis added.)  Defense counsel did not object to these comments in closing, although the jury was nonetheless instructed before deliberations that it should consider the testimony of a cooperating witness who is hoping to receive a reduction in sentence with more caution than the testimony of other witnesses.

This court has held that it is not improper vouching for the prosecutor to refer to the plea agreements of cooperating witnesses in the expectation that their credibility will be at issue.  *United States v. Owens*, 426 F.3d 800, 806 (6th Cir. 2005).  Nor is it improper vouching to elicit testimony that the plea agreement contains a promise to testify truthfully.  *Francis*, 170 F.3d at 550.  The existence of a plea agreement can cut both ways, either "support[ing] the witness' credibility by showing his or her interest in testifying truthfully," or, as the defense argued in this case, "impeach[ing] the witness' credibility by showing his or her interest in testifying as the government wishes regardless of the truth."  *United States v. Townsend*, 796 F.2d 158, 163 (6th Cir. 1986).

However, as we explained in *Francis*, a "potential for impropriety emerges [] when a prosecutor explains that there is to be a recommendation to the witness's sentencing court whether the terms of the plea agreement have been adhered to."  170 F.3d at 550.  This is so "[b]ecause that recommendation is dependent upon whether the witness testifies truthfully," making it "easy for a prosecutor to imply, either intentionally or inadvertently, that the prosecutor is in a special position to ascertain whether the witness was, in fact, testifying truthfully."  *Id*.  That was the case in *Francis*, where the prosecutor not only emphasized that she would be making a recommendation to the judge regarding the reduction in sentence, but also established through the

questioning of the witness that the plea offer was made only after being satisfied that the witness was telling the truth. Similarly, it was improper for the prosecutor in *Carroll* to state that the witness would stay in jail if the government found out that the witness had lied. *United States v. Carroll*, 26 F.3d 1380, 1382 (6th Cir. 1994).

In this case, the prosecutor elicited testimony regarding the terms of the plea agreements and commented on that evidence in closing argument without implying that the government would be making recommendations to the court about the sentence reductions. Rather, the prosecutor made sure to emphasize that it was the judge who would decide whether to grant any reduction in sentence for providing substantial assistance. Each witness confirmed his understanding that testifying falsely would result in the forfeiture of the benefit of the plea agreement and the possibility of an additional charge for perjury. Because the prosecutor limited his questions and comments to those facts and did not imply any special knowledge regarding the credibility or truthfulness of the cooperating witnesses, the prosecutor did not improperly vouch for the witnesses. Finding that the prosecutor's questions and comments were not improper, we need not address the second part of the inquiry.

### 2.    Amy Hoskins

Amy Hoskins (Hoskins) was a 16-year-old juvenile who was placed in foster care during part of 2001 and 2002 at the Children's Home operated by Donna Reid. The Reids lived at the Children's Home for a time, as did Marty and Shawn Hensley. Hoskins testified that she saw a safe in the closet of the master bedroom—providing support for testimony that Stewart gave Reid $100,000 in cash to store at the Children's Home. There was also conflicting evidence from a number of witnesses about whether and when a safe was kept there. Defendants emphasize as the most damaging the testimony from Hoskins that she woke late one night and observed Reid and Jackson at the kitchen table, where money and marijuana was piled, while Donna Reid sat nearby watching television. Jackson did not mention this incident in his testimony, and the defense attacked Hoskins through character evidence and by eliciting her admission that she had sex with Shawn Hensley (Hensley) while living at the Children's Home.

In this claim of error, the Reids argue that the prosecutor impermissibly vouched for the credibility of Hoskins in his rebuttal closing argument.  The comments to which defendants object are set forth in context below:

> But, again, the defense has an extreme hard time dealing with Amy Hoskins, because Amy Hoskins, despite their two attempts to disparage her character —Loretta France, who's deemed by Social Services as unfit to act as a foster parent any longer because she's unreliable, came in here and told you that in her opinion that Amy Hoskins would not be truthful, but she is respectful.  And then they would say, well, she's motivated by this affair.  The question you've got to ask yourself is, who was telling you the truth when they were under the oath?  *Do you think Amy Hoskins would have admitted to you that affair if she was an untruthful person?*  Do you think she would have admitted that?  A 16-year-old, and at that time I estimate Shawn Hensley to be 23, she admitted that they had an affair.  She didn't lie to you about it, but counsel would argue to you that that's such a moral failure on a 16-year-old's behalf you can't believe her.  She'll admit it to you, she won't lie to you about it, but don't believe her.

> Or that there's this motive, that deep-seated within this young lady is some deep hatred toward Wayne Reid and Donna Reid and that she came in here and she schemed up this lie, despite the fact that Agent Briggs only interviewed her twice, and that was in February of '04.  If you recall, that was before this money laundering case was ever – or he was looking for the fugitive Larry Golden Jackson, Jr.  And she's been disparaged here in argument that somehow that was a mortal fatal flaw for her not to testify or give Agent Briggs the full story about the entire time that she was there and what all she saw.

> Now, Amy Hoskins, in the course of her testimony, it would be represented to you that she schemed this up.  Well, if she schemed it up, ladies and gentlemen of the jury, don't you think she could have done a little better job of that?  I mean, if she was going to make this up on Wayne and Donna Reid, why have Donna Reid sitting watching TV with her back toward Larry and Wayne while they're counting out the money and the drugs are on the table? . . . [C]ouldn't she lie a little bit better than that? . . . No, her testimony was very consistent, it was very vivid and detailed, and you had an opportunity to hear, observe her testimony.

> And then we've heard again rebuttal testimony from her social worker, who's known her since 1996, and says that in her opinion Amy Hoskins will tell you straight up just the way it is.

> And is her testimony unsupported?   Absolutely not.   *Her testimony is supported by four people who are subject, again, to the penalty of perjury and also the possibility of further criminal charges.*

(Emphasis added.)  As there was no objection to this argument, our review is for plain error.

Defense counsel attacked the credibility of Amy Hoskins, and the prosecutor was free to respond by arguing that she should be believed.  Neither the rhetorical question about whether Hoskins would have admitted the affair if she were an untruthful person, nor the statement that her testimony was supported by the testimony of the cooperating witnesses, could reasonably be construed as a statement of personal belief in her truthfulness.  *United States v. Green*, 305 F.3d 422, 430 (6th Cir. 2002); *United States v. Emuegbunam*, 268 F.3d 377, 404-05 (6th Cir. 2001).  Without expressing a personal opinion or belief regarding the truth or falsity of a witness's testimony, the prosecutor may argue that the jury should arrive at a particular conclusion based on the evidence.  *United States v. Henry*, 545 F.3d 367, 379 (6th Cir. 2008); *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999) (abrogated on other grounds).  Since the challenged comments were not improper, there is no error, plain or otherwise.

**B.       Limitation on Impeachment**

Next, the Reids argue that the district court erred by limiting the cross-examination of Hensley and Hoskins regarding the adultery committed while Hoskins was living at the Children's Home.  Shawn Hensley was asked on cross-examination if there was a problem that caused his divorce in September 2004.  Hensley answered only that he and Marty did not get along anymore and that they had both "made mistakes."  Defense counsel then asked if Hensley had been having "sexual relationships with a child" at the Children's Home.  The government immediately objected and, at sidebar, defense counsel represented that Hensley was "courting a 14-year-old girl who was living at the home."  The district court would not permit further questioning about this allegation since it was not the subject of a conviction, despite defense counsel's argument that it was relevant to show bias against the defendants.  However, when Hensley was later asked whether he had any animosity toward the defendants, he

answered that he did not have any. Hensley also testified that the defendants had been "awful good to [him]."[4]

The adultery was raised again during the cross-examination of Amy Hoskins. The government objected, but defense counsel was permitted to make a record outside the presence of the jury. When asked, Hoskins admitted to having had a sexual relationship with Hensley and reported that she was removed from the Children's Home when it was discovered. She also clarified that she was 16 years old at the time, and that she was given a choice about whether to return to the Children's Home. Based on this proffer, the district court permitted limited inquiry into the subject on cross-examination. Specifically, the jury heard Hoskins admit that she had committed adultery with Hensley while she was 16 years old and living at the Children's Home. Hoskins also volunteered: "He came to me."

Citing only Fed. R. Evid. 401 and 402, defendants assert that the denial of the right to vigorously cross-examine Hensley and Hoskins about their adulterous relationship requires reversal. We review a district court's decision to limit the scope of cross-examination for abuse of discretion. *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002); *Stevens v. Bordenkircher*, 746 F.2d 342, 347 (6th Cir. 1984). The district court retains "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Further inquiry into the details of the sexual relationship was collateral to the issues of bias and credibility, and the record shows that the defendants were able to elicit enough information about the adultery and divorce to argue in closing that adultery is devastating to relationships and that being removed from the Children's Home may have

---

[4]Defendants complain that the district court also admonished Donna Reid outside the presence of the jury because she had been overheard whispering to someone in the gallery: "She was 14." Because this was not the first attempt to inject excluded matters, the district court threatened contempt if it happened again. Defendants do not articulate this as a separate claim of error.

motivated Hoskins to seek revenge against the Reids.  With respect to the latter contention, defense counsel specifically argued:

> Of course, Amy's a kid.  She's not mindful of the harm and hurt that she's caused.  It's just a momentary pleasure for her and maybe sport. . . . But there's a consequence to that.  And she left the [C]hildren's [H]ome shortly after that.  And maybe she's bitter at them because, you know, she had that relationship with Shawn Hensley and she had to go elsewhere.  Maybe that motivated her to get even with them, get back at them.  I think you should bear that in mind when you consider what she told you.

Defendants provide no explanation of how further testimony about the affair would have shown bias or motivation to testify unfavorably.  Moreover, while Hoskins's testimony was damaging to the defendants, her testimony was disputed by other witnesses and she was impeached with her own prior inconsistent statements.  There was also evidence from several witnesses who stated that Hoskins had a bad reputation for truthfulness, although that testimony was contradicted, in turn, by a social worker who had known Hoskins for many years.

We cannot conclude that the district court abused its discretion in limiting the extent of the questions concerning the adulterous sexual relationship between Hoskins and Hensley.

**C.       Other Evidentiary Claims**

Wayne Reid claims reversible error in the district court's limitation of the scope of character evidence offered through the opinion of Robert Mobley (Mobley).  Mobley, President of the Crusade for Christ Evangelistic Association, was asked whether he had an opinion as to Reid's reputation for "integrity, honesty and fair dealing" among his friends and associates in the year 2000 or before.  The government objected, mistakenly citing to Fed. R. Evid. 608's limitation on evidence of the character or reputation of a *witness*, and the district court sustained the objection.  As a result, defense counsel modified the question posed to Mobley, who testified that Reid's reputation for "truth and veracity" was "good."  Unsolicited, Mobley quickly volunteered, "I don't know of a bad word that's been spoken of him."

Conceding on appeal that Fed. R. Evid. 404(a)(1) permits an accused defendant to offer evidence of a "pertinent trait of character," the government insists that "truth" and "veracity" were the pertinent character traits in this case. In fact, Reid does not explain in what way his reputation for "integrity, honesty, and fair dealing" would be distinct from his reputation for "truth and veracity." The absence of a proffer suggests that it was only an opinion as to Reid's reputation for "integrity, honesty, and fair dealing" that defendant sought to introduce into evidence.

Even if Reid had articulated a basis for distinguishing between these traits, we find any error in the exclusion of this testimony to be harmless. *United States v. Baldwin*, 418 F.3d 575, 581 (6th Cir. 2005). "An error is harmless 'when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id*. at 582 (citation omitted). In fact, Mobley was only one of three witnesses who testified regarding Reid's character. The other character witnesses testified (1) that Reid had a "good" reputation for "truth and veracity," and (2) that Reid had a "good" reputation for "*integrity, honesty, and fair dealing*." (Emphasis added.)

Finally, Donna Reid contends that it was error to exclude testimony that she was charged by way of the second superceding indictment in order to "tighten the screws" on Wayne Reid to get him to plead guilty. Counsel for Donna Reid attempted to ask Special Agent Timothy Briggs whether he had said as much, but the district court sustained the government's objection because that evidence would imply prosecutorial misconduct that should have been raised before trial. In a proffer made outside the presence of the jury, a prosecution witness testified that Briggs had made this statement to him after delivering a trial subpoena. The district court excluded this evidence as hearsay and because it was directed at establishing selective prosecution with respect to the indictment against Donna Reid.

As the district court explained, "a motion alleging a defect in instituting the prosecution" must be raised pretrial. FED. R. CRIM. P. 12(b)(3)(A). No claim of selective prosecution or prosecutorial misconduct was asserted before or after trial, which precludes review by this court. *United States v. Henderson*, 174 F. App'x 880, 883 (6th Cir. 2006). In fact, defense counsel has expressly disavowed any such claim

on appeal.  Instead, Donna Reid argues that she wanted to present this evidence to the jury as a "statement against interest" pursuant to Fed. R. Evid. 804(b).  This rationale was not articulated in the district court, would not seem to apply because it requires an unavailable declarant, and would not avoid the fact that the evidence was unquestionably aimed at injecting an inference of prosecutorial misconduct into the proceedings.  The district court did not err in excluding this evidence.

**AFFIRMED.**