BOGGS, J., delivered the opinion of the court, in which BATCHELDER, C.J., GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, and KETHLEDGE, JJ„ joined.
DAUGHTREY, J. (pp. 754-63), delivered a separate dissent, in which MARTIN, MOORE, COLE, CLAY, STRANCH, and DONALD, JJ., joined. WHITE, J. (pp. 763-67), delivered a separate dissent.
OPINION
BOGGS, Circuit Judge.
John David Stumpf filed a petition for a writ of habeas corpus in federal district court following unsuccessful state attacks on his conviction and death sentence for a murder that he committed with Daniel Wesley. The district court denied the petition. We reversed that judgment, but the Supreme Court unanimously reversed us. Bradshaw v. Stumpf, 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005). The court remanded so that we could consider what is now Stumpf s primary argument: that his due-process rights were violated at sentencing. This is so, he argues, because the State, in a wholly separate proceeding following his conviction and sentence, presented new evidence, which arose after his trial, that Wesley may have actually fired the fatal shots.
Because all of the available evidence was at all times presented to all of the courts involved, and because the Ohio courts, both trial and appellate, independently weighed all of the available evidence and found death to be the proper sentence, no due-process violation occurred. We now affirm the district court.
I
On May 14, 1984, Stumpf, Clyde Daniel Wesley, and Norman Leroy Edmonds drove along Interstate 70 near Washington, Pennsylvania. The three had been drinking at a nearby bar and continued to drink from a supply of beer they had in the car. Also in the car were three handguns: a nine-millimeter that belonged to Edmonds, a chrome-plated .25-caliber Raven that also belonged to Edmonds, and a .25-caliber Armi that belonged to Wesley.
Around dusk, Stumpf, Wesley, and Edmonds pulled over in Guernsey County, Ohio. Stumpf and Wesley walked to a home some hundred yards away from the road and rang the doorbell. Both were armed. Norman Stout and his wife, Mary Jane, were seated at their kitchen table. Mr. Stout answered the door. Stumpf and Wesley convinced Mr. Stout to let them in the house, claiming that they needed to use the phone. Robbery, though, was their aim. After Stumpf used the phone — and wiped it with a handkerchief — he and Wesley drew their guns and told the Stouts that a robbery was in progress. Stumpf and Wesley herded the Stouts into a bedroom, where Stumpf held them at gunpoint while Wesley scoured the house.
Mr. Stout eventually moved toward Stumpf. Stumpf shot him between the *743 eyes with the Raven. Undeterred, Mr. Stout grappled with Stumpf, who pushed him into a second bedroom across the hall. Although Mr. Stout does not remember when, he was shot again, this time in the top of the head. Mr. Stout also suffered a bruise consistent with being struck by the butt end of a gun. The next thing that Mr. Stout remembers is hearing two male voices conversing in a normal tone, followed by four gunshots. Mr. Stout again lost consciousness; his next recollection was being in the ambulance on the way to the hospital.
The four shots that Mr. Stout heard were the shots that killed his wife, Mary Jane. Three went into the left side of her face, one went through her left wrist. All four bullets came from the same gun, as did the bullets used to shoot Mr. Stout.[1] Stumpf and Wesley drove off in Mrs. Stout’s car with the proceeds of their crime. Stumpf threw the Raven out the window.
Edmonds, who had been waiting in the car on the side of the road, saw Mrs. Stout’s car pull out of the garage. Frightened, he drove away. He stopped for gas in New Concord, Ohio, made a phone call to his family in Texas, and left without paying for his gas. Two men chased him, but quit their pursuit when Edmonds fired his nine-millimeter pistol at them. Edmonds went back to Washington, Pennsylvania.
The next day, Stumpf and Wesley abandoned Mrs. Stout’s car after wiping it clean of fingerprints. They reunited with Edmonds, and sold the nine-millimeter pistol and a .357 Magnum that they stole from Mr. Stout for travel money. Wesley and Edmonds drove back to Texas; Stumpf stayed in Pennsylvania.
Investigators found Edmonds by tracing the phone call that he made from the gas station. After his arrest, Edmonds implicated Stumpf and Wesley. The police issued arrest warrants for both. When he learned of the warrant for his arrest, Stumpf surrendered, denying any involvement in the crimes. After he found out that Mr. Stout survived, however, Stumpf admitted that he participated in the robbery and that he shot Mr. Stout in the head. Still, he claimed that he went straight to Mrs. Stout’s car after shooting Mr. Stout, and thus was not in the house when Mrs. Stout was killed.
Prosecutors indicted Stumpf on charges of aggravated murder, attempted aggravated murder, aggravated robbery, and two counts of grand theft — one of an automobile and the other of a firearm. Included with the aggravated-murder charge were four specifications, three of which made Stumpf eligible for the death penalty. Stumpf waived his right to be tried by a jury, and the case proceeded in front of a three-judge panel. Before trial began, Stumpf decided to plead guilty. The plea bargain provided that Stumpf would plead guilty to aggravated murder, aggravated attempted murder, and the specification of using a firearm while committing a felony. He also admitted to one of the three capital specifications charged — committing murder for the purpose of escaping detection, apprehension, trial, or punishment for attempted robbery and attempted aggravated murder. In return, the State would drop the remaining charges. The three-judge panel conducted an evidentiary hearing to determine whether there was a factual basis. Satisfied that there was, the panel conducted a colloquy and accepted Stumpf s plea.
*744 Because Stumpf was eligible for the death penalty even after his plea, the three-judge panel held a sentencing hearing. There, Stumpf s leitmotif was that he acted under Wesley’s influence. He claimed that his propensity for being a follower, rather than a leader, his consumption of alcohol, his youth,[2] and his limited mental abilities made him extraordinarily susceptible to Wesley’s influence. Stumpf also suggested that his respect for women generally and his lack of a significant criminal history reinforced the claim that he was simply following Wesley’s lead. Finally, Stumpf argued — based on his own unsworn statement and inferences drawn from the evidence — that he was a participant in Mrs. Stout’s murder, but not the principal offender.[3] He claimed that he dropped the Raven during his struggle with Mr. Stout and ran out of the house in panic, then remained outside of the house until Wesley instructed him to drive Mrs. Stout’s car, after Wesley fired the shots that killed Mrs. Stout.
The State told a different story. It emphasized that Stumpf “did most of the talking ... [and was] the one that used the telephone” when Stumpf and Wesley first approached the Stouts’ home, noted that Stumpf wiped his fingerprints off of the receiver after he finished using it, and reminded the judges that Mr. Stout did not recall Stumpf dropping his gun and did hear two male voices conversing at a normal volume before hearing the four gunshots that killed his wife. In addressing the principal-offender argument directly, the prosecutor said:
I don’t believe it is necessary for this court to conclude that [Stumpf] was the principal offender, that is, the actual shooter. I think there is ample evidence — I’m not conceding that at all. I think there’s ample evidence in this record that this defendant fired the four shots into the body of Mary Jane Stout.
The prosecutor then pointed to inconsistencies in accounts that Stumpf had given at various points and continued: “So, there’s ample, ample evidence in this record to make the reasonable inference that this defendant shot both those individuals.” Still, the State again emphasized, the panel could impose the death penalty even if it did not believe that Stumpf had killed Mrs. Stout himself. The panel, after deliberation, found “beyond a reasonable doubt that the defendant was the principal offender” in Mrs. Stout’s murder and imposed the death penalty.
Meanwhile, Wesley had been arrested in Texas. After being extradited to Ohio, he shared a cell with James Eastman. Eastman claimed that Wesley told him that he, not Stumpf, fired the shots that killed Mrs. Stout. Wesley stood trial in front of a jury. The same judge who presided over Stumpf s three-judge panel presided over Wesley’s trial. The same prosecutor tried the case. This time, after presenting Eastman’s evidence,[4] the prosecutor ar *745 gued that Wesley was the principal offender and therefore deserved to be put to death. Wesley, who took the stand in his own defense, claimed that Stumpf shot Mrs. Stout. Wesley’s counsel also noted that the prosecutor had taken the position that Stumpf was the principal offender in Stumpfs trial, and that Stumpf had been sentenced to death for the crime. The jury found Wesley guilty of aggravated murder and, after a sentencing trial, recommended that he be sentenced to life in prison, with the possibility of parole after twenty years.
When Wesley’s trial ended, Stumpf, whose case was still pending on direct appeal, went back to the three-judge panel. He asked that the panel either allow him to withdraw his guilty plea or vacate his death sentence. Eastman’s testimony and the State’s presenting that testimony at Wesley’s trial, Stumpf argued, cast doubt on his conviction and sentence. The State — again represented by the same prosecutor who tried both Stumpf and Wesley — disagreed. At a hearing conducted by two of the three judges who heard Stumpfs case (the other judge having died in the interim), the prosecutor argued that the panel first must determine whether Eastman’s testimony changed its earlier principal-offender determination. If that determination changed, the prosecutor suggested, the court should consider whether the death penalty was still appropriate.
Nevertheless, the prosecutor urged that ballistics evidence and Wesley’s testimony suggested that Stumpf, not Wesley, was the principal offender. One of the judges responded:
[I]f we had not been satisfied that Stumpf was, in fact, the trigger man, the principal offender, and we were satisfied that he was, in fact, an aider and abettor, that may very well have had an effect upon this Court’s determination of whether the death penalty should follow. I’m not saying it would, but it’s possible.
The prosecutor agreed, suggesting that “the first decision this Court would have to make is whether or not this additional information changes the picture as to that finding that was previously made.” The judge persisted, asking whether there was any evidence “[i]n the record so far that, in fact, Wesley was the trigger man.” Stumpfs counsel pointed to Eastman’s testimony at Wesley’s trial. The judge asked: “don’t we have some right to read that and determine whether that is, in fact, credible testimony?” Stumpfs counsel answered in the affirmative. The judge then told the parties: “I haven’t read it [Eastman’s testimony]. I’m certainly going to take the privilege to do so.... I’m going to read both Eastman and Wesley because I didn’t have the privilege of hearing that testimony.”[5]
Stumpfs original panel denied relief in a summary order, stating that “the court took [Stumpfs motions] under advisement and after having considered the same, does overrule the Motion to Withdraw Former Plea and the Alternative Motion to Set Aside the Sentence Imposed.” The case returned to the Ohio Court of Appeals. There, Stumpf assigned a number of errors, including a claim that the panel should have vacated his sentence in light of Eastman’s testimony. The Court of Appeals disagreed. First, it addressed the panel’s decision directly, flatly rejecting the proposition that the State’s trying Wesley as a principal offender after securing a conviction against Stumpf made either Stumpfs conviction or the imposition *746 of the death penalty inappropriate. Then, as it was obligated to do under Ohio Revised Code § 2929.05, the Court of Appeals independently weighed “the facts and other evidence disclosed in the record in the case,” id. § 2929.05(A), including Eastman’s testimony. It “independently ... examinefd] two ... questions: (1) Do the facts and evidence in the record satisfy us that the aggravating circumstances of which Stumpf was found guilty outweigh the mitigating factors? and, (2) Is the sentence of death appropriate?” The court emphasized: “We must be independently persuaded that the answer to both of these questions is ‘yes’ to affirm the death sentence.” The court answered the first question in the affirmative. Addressing the second, it specifically found that “the evidence supports the conclusion that it was Stumpf, not Wesley, who pulled the trigger that propelled the four bullets into the body of the victim.” The court affirmed.
Stumpf continued to pursue appellate relief, this time in the Ohio Supreme Court. Like the Ohio Court of Appeals, that court first considered Stumpfs claim that the panel erred, either by refusing to let him withdraw his plea or by refusing to vacate his death sentence. The court held that neither decision was error-. First, it concluded that the panel correctly decided that Stumpf was not entitled to withdraw his guilty plea. Then, the court considered the impact of Eastman’s testimony directly, noting Stumpfs argument that Eastman’s “testimony would have tended to establish a mitigating factor ... and therefore a new sentencing hearing is necessary in order to allow the panel to consider it.” State v. Stumpf, 32 Ohio St.3d 95, 512 N.E.2d 598, 608 (1987). It first analogized Stumpfs request to “a motion for new trial based upon newly discovered evidence,”[6] ibid., and therefore held that the abuse-of-discretion standard applied. The court then specified that “[a] defendant is not entitled to a new sentencing hearing merely by coming forward with some additional evidence after the initial sentencing hearing,” suggested that the panel “apparently determined that Eastman’s testimony added insufficient mitigating weight to affect its balancing of the mitigating factors against the aggravating circumstance,” and found “no error in that determination.” Id. at 609. It explained: “Eastman’s testimony is hearsay and, in the face of the evidence adduced at appellant’s sentencing hearing, of minimal weight. As such, it is too attenuated to warrant a *747 vacation of appellant’s sentence and a new sentencing hearing.” Ibid.
After considering Stumpfs assignments of error, the Ohio Supreme Court independently considered whether the crime’s aggravating circumstances outweighed any mitigating factors, as it too was required to do under Ohio Revised Code § 2929.05. It answered in the affirmative, making a special “finding] that the testimony of a cellmate during Clyde Wesley’s trial is of minimal credibility.” Stumpf, 512 N.E.2d at 610. The court then moved to its “final task ... to determine whether the sentence of death is appropriate.” Ibid. It held:
the imposition of the death penalty in the cause sub judice is neither excessive nor disproportionate. Further, the fact that appellant’s co-defendant Wesley received a life sentence with parole eligibility after twenty years for his part in Mrs. Stout’s murder is not an impediment to affirming the death sentence in the instant case. The life sentence given to Wesley is the verdict of a jury in a separate trial.
Id. at 611.
After unsuccessfully pursuing state post-conviction remedies, Stumpf filed a petition for writ of habeas corpus in federal court. The district court denied relief, but granted a certificate of appealability on four claims: (1) that Stumpfs guilty plea was not knowing or voluntary; (2) that the state’s first presenting, then casting doubt on, Eastman’s evidence violated his due-process rights; (3) that he received ineffective assistance of counsel at sentencing; and (4) that the Ohio death-penalty statute was unconstitutional, facially and as-applied. Stumpf v. Mitchell, 367 F.3d 594, 596 (6th Cir.2004). With one judge dissenting, we reversed on “either or both” of the first two grounds. Ibid.
The Supreme Court granted certiorari and unanimously reversed in part, vacated in part, and remanded.[7] We erred, the Court first held, by finding that Stumpfs plea was unknowing and involuntary. Bradshaw v. Stumpf, 545 U.S. 175, 182-86, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005). Also in error was our holding “that prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding Stumpfs guilty plea,” since “the precise identity of the triggerman was immaterial to Stumpfs conviction for aggravated murder. ... [and] Stumpf has never provided an explanation of how the prosecution’s postplea use of inconsistent arguments could have affected the knowing, voluntary, and intelligent nature of his plea.” Id. at 186-87, 125 S.Ct. 2398. The Court, however, suggested that “[t]he prosecutor’s use of allegedly inconsistent theories may have a more direct effect on Stumpfs sentence ... for it is at least arguable that the sentencing panel’s conclusion about Stumpfs principal role in the offense was material to its sentencing determination.” Id. at 187, 125 S.Ct. 2398. It noted that the majority did not clearly distinguish between Stumpfs challenge to his conviction and his challenge to his sentence. Thus, the Court “expressed no opinion on whether the prosecutor’s actions amounted to a due process violation, or whether any such violation would have been prejudicial,” with respect to Stumpfs sentencing claim. Ibid. Instead, the Court gave us “the opportunity to consider, in the first instance, the question of how Eastman’s testimony and the prosecutor’s conduct in the Stumpf and Wesley eases relate to Stumpfs death sentence in particular.” Id. at 187-88,125 S.Ct. 2398.
On remand, again with one judge dissenting, we held that the State violated Stumpfs due-process rights by presenting, *748 then casting doubt on, Eastman’s testimony. Stumpf suffered prejudice from this violation, we reasoned, “[bjecause all indications are that the three-judge panel that sentenced Stumpf to death would not have done so had the state not persisted in” arguing that Stumpf was the principal offender. Stumpf v. Houk, 653 F.3d 426, 439 (6th Cir.2011). We granted rehearing en banc and vacated that opinion. Id. at 426.
II
“Because Stumpf filed his habeas petition before enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we review his claims under the standards of the pre-AEDPA habeas statute.” Stumpf, 545 U.S. at 182, 125 S.Ct. 2398. “Thus, we presume the correctness of state court factual findings, which are rebuttable only by clear and convincing evidence,” Abdur’Rahman v. Colson, 649 F.3d 468, 472 (6th Cir.2011), but review questions of federal law and mixed questions of federal law and fact de novo. Sowell v. Anderson, 663 F.3d 783, 789 (6th Cir.2011). We therefore consider Stumpfs due-process claim, which presents a mixed question of law and fact, de novo.

III

A
The Due Process Clause prohibits the state from “depriving] any person of life, liberty, or property, without due process of law.” U.S. Const, amend. XIV, § 1.
As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.
Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941).[8] “In the field of criminal law, [the Supreme Court has] defined the category of infractions that violate ‘fundamental fairness’ very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.” Medina v. California, 505 U.S. 437, 443, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (internal quotation marks and alterations omitted). Thus, state action “is not subject to proscription under the Due Process Clause unless ‘it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.’ ” Patterson v. New York, 432 U.S. 197, 201-02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (Cardozo, J.)); see also Medina, 505 U.S. at 443, 112 S.Ct. 2572.
To determine whether any such thing happened here, we must consider the *749 precise nature of Stumpfs claim. Stumpf does not argue that the State knowingly misrepresented evidence, Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), presented false or misleading testimony, Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), failed to correct false testimony, Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), or withheld materially exculpatory evidence, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Nor does he claim that new evidence suggests that he is actually innocent, Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), nor that the state withheld materially exculpatory evidence that it discovered after sentencing, cf. Dist. Attorney’s Office for the Third Judicial Dist. v. Osborne, 557 U.S. 52, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009). Instead, Stumpf claims that the State’s argument about Eastman’s testimony at the hearing on his post-sentencing motion retroactively rendered his sentence — which was the result of earlier proceedings that he does not challenge- — -fundamentally unfair because the State’s argument about Eastman’s testimony at his post-sentencing hearing differed from the State’s argument about the same testimony in Wesley’s trial. This is so, Stumpf urges, even though his sentencing panel, the two appellate panels conducting mandatory independent review, and the jury in the other case were able to consider the same body of evidence and hear argument from the State and the defendant about the evidence in both cases.
To state Stumpfs claim is to refute it. Nothing misleading or deceitful happened here. The prosecution did not present a different and incomplete set of facts in support of different theories of culpability for the same crime. Cf. Thompson v. Calderon, 120 F.3d 1045, 1056 (9th Cir.1997) (en banc) (plurality opinion) (“The prosecutor presented markedly different and conflicting evidence at the two trials.”) (emphasis added), vacated on other grounds, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). It did not offer different (and contradictory) testimony from the same witness in Wesley’s trial, without acknowledging the contradiction. Cf. Smith v. Groose, 205 F.3d 1045, 1051 (8th Cir.2000) (“[T]he prosecutor chose at Smith’s trial to use Lytle’s December 2,1983, statement to secure Smith’s conviction and then later, at Cunningham’s trial, elected to use Lytle’s November 30, 1983, statement to secure Cunningham’s conviction. Lytle’s testimony constituted the only evidence of when the murders occurred and was the sole basis for two different convictions on two contradictory theories.”). And it did not omit evidence of Wesley’s or Stumpfs guilt or innocence from its presentation. Cf. In re Sakarias, 35 Cal.4th 140, 25 Cal.Rptr.3d 265, 106 P.3d 931, 936-37 (2005) (discussing prosecutor’s omission of key evidence in each of two prosecutions of co-defendants, leading to conviction of both). Eastman’s evidence did not exist during Stumpfs original sentencing proceeding. After the State presented Eastman’s hearsay statement in Wesley’s trial and Stumpf moved for relief, the State stipulated to the evidence’s admissibility. Then, three panels in Stumpfs case were able to consider the mitigating evidence at issue, Eastman’s claim that Wesley had admitted to firing the shots that killed Mrs. Stout. Each had the opportunity to weigh that evidence against all of the other evidence in the record. Despite Eastman’s testimony, each concluded that the death penalty was appropriate. All that the prosecution did was to- argue for two different inferences from the same, unquestionably complete, evidentiary record. It left the fact-finder in Wesley’s trial and the factfinders in Stumpfs post-sentencing proceedings to find the facts. This, without more, does not offend the Due Process Clause.
*750 Stumpf s paean to the prosecutor’s duty does not change this conclusion. It is true that, “while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones.” Berger v. United, States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). And indeed, a defendant is entitled to relief when a prosecutor’s “comments so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotation marks omitted). But there is nothing foul about the prosecutor’s conduct here. Each of the prosecutor’s two arguments, taken alone, was proper. Each rested on a full evidentiary record. In each instance, opposing counsel responded to the State’s argument by pointing out the inconsistency in the State’s theory. The mere fact that the State argued for different inferences in different cases does not make either argument so unfair that it violates the Due Process Clause.
This is a stark contrast to Supreme Court cases where a prosecutor’s conduct violated the Due Process Clause. In each of those cases, the prosecutor did something to subvert the very foundation of the trial, something that kept the factfinder from making a fully informed decision. Thus, in Miller, 386 U.S. at 6-7, 87 S.Ct. 785, the Court held that a prosecutor’s “consistent and repeated misrepresentation [reinforced by testimony from a state chemist] that [a paint-stained pair of underwear] was, indeed, ‘a garment heavily stained with blood’ ” violated the Due Process Clause. Likewise, in Mooney, 294 U.S. at 112, 55 S.Ct. 340, the Court explained that “depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known, to be perjured” was a due-process violation, (emphasis added); see also Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Napue, 360 U.S. at 269, 79 S.Ct. 1173, followed suit, confirming that a due-process violation occurs “when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.” And, of course, Brady, 373 U.S. at 87, 83 S.Ct. 1194, held that a state may not withhold materially exculpatory evidence that it possesses before trial. In each case, the prosecutor’s action prevented the factfinder from making a fully informed decision; in each case the prosecutor’s action violated the Due Process Clause’s guarantee of fundamentally fair proceedings.
Here, by contrast, the prosecution presented all of the evidence that it had. The factfinders then had — and took — the opportunity to consider the entire record. First was Stumpfs original sentencing panel. There, the very judge who speculated that, were Stumpf an aider and abettor, the panel’s sentencing determination may have been different told the parties in open court: “I haven’t read it [Eastman’s testimony]. I’m certainly going to take the privilege to do so.... I’m going to read both Eastman and Wesley because I didn’t have the privilege of hearing that testimony.” The other judge on the panel had presided at Wesley’s trial and thus heard Eastman’s testimony live. After considering Eastman’s testimony, Wesley’s testimony, and the evidence that it had already heard, the panel declined to revisit its earlier determination that the death penalty was appropriate. Two more independent reviews followed; twice more Stumpf was able to argue that the inconsistency in the prosecutor’s argument meant that he should not be sentenced to death before a panel required independently to weigh aggravating factors and mitigating factors and determine whether the death penalty was warranted. Twice more the Ohio courts held that the death penalty was appropriate. That Stumpf lost means neither that the factfinders *751 failed to consider his argument, nor that the process used to affirm his death sentence was fundamentally unfair. A criminal defendant has the right to a fair proceeding in front of an impartial factfinder based on reliable evidence. He does not have the right to prevent a prosecutor from arguing a justifiable inference from a complete evidentiary record, even if the prosecutor has argued for a different inference from the then-complete evidentiary record in another case. The prosecutor’s allegedly inconsistent arguments do not violate the Due Process Clause.
B
The arguments made in Judge Daughtrey’s dissent rely on an alternate interpretation of the record, one colored by the dissent’s condemnation of the “utter disregard displayed by both the Ohio courts and the majority ... for the crux of Stumpfs habeas claim.” J. Daughtrey Dissent, at 759 (emphasis added). The dissent does not differ with the accuracy of our quotations from the record, nor we with its. But the Ohio courts had before them every speck of available testimony in both trials, which were presided over and reviewed by jurists who were fully capable of assessing the merits of a lawyer’s argument.
The instant case involves the presentation of legal arguments to a panel of judges, not the presentation of perjured testimony to a jury, as referenced id. at 760. Judge Daughtrey’s dissent charges the prosecution with “misrepresenting the strength of Stumpfs motion” (otherwise known as arguing against it), and “refusing to admit to the egregious mistake made during Stumpfs original trial.” Ibid. As to the latter point, it is not clear if the mistake is in not wholly believing Eastman, or in not “admitting]” that Eastman’s jailhouse testimony somehow completely and retroactively subverts the concededly fair trial that originally occurred. In either event, it is inconceivable that the prosecution’s argument before the subsequent panel of judges is analogous to the presentation of perjured testimony or the misrepresentation of evidence. Making legal arguments from the record (which contained the testimony of Eastman and much evidence in contradiction, including testimony from Wesley himself) can hardly be called “chicanery,” an “affirmative effort to deceive the court,” or “a refusal to correct known error.” See ibid.
To the extent that the Ohio courts drew the conclusion that Stumpf was the principal offender in this crime, it is hardly obvious from the record that this conclusion was “less-than-accurate,” and it is obvious that the conclusion did not go “unchecked.” See ibid. The state introduced the very evidence that would be thought to check that impression and for which it had to answer in its argument before the Ohio courts. It would appear that what the dissent is charging as constitutional error is nothing more nor less than the crime charged against Socrates: that he “made the worse appear the better cause.” See Plato, Apology (Benjamin Jowett trans.), in 2 Harvard Classics 3, 4 (Charles W. Eliot ed., 1909). We reject this contention.
C
But even if there were a constitutional violation, which there was not, that violation would only warrant granting the writ if it had a “substantial and injurious effect or influence in determining” the outcome of the proceeding. Rosencrantz v. Lafler, 568 F.3d 577, 590 (6th Cir.2009) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)); Stewart v. Erwin, 503 F.3d 488, 501 n. 5 (6th Cir.2007) (noting that Brecht standard applies to a sentencing challenge).
*752 Because Stumpf asks us to invent a new due-process right, we have never determined whether that right would be subject to harmless-error analysis. But we have no trouble concluding that it would. In Rosencrantz, we considered whether a prosecutor’s knowing presentation of false testimony was subject to Brecht’s harmless-error analysis. We held that it was, noting that the presentation of false evidence was a “trial error — it occurred during the presentation of the case to the jury, and is one which may be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless.” Rosencrantz, 568 F.3d at 589 (internal quotation marks and alterations omitted). Here too we consider an alleged error that involves a prosecutor’s presentation to a factfinder. If anything, the case for harmless-error analysis is stronger here, where the factfinders were able to consider all of the evidence, and the only alleged violation hinges on the prosecutor’s argument, not any suppression or falsification of evidence. See Broom v. Mitchell, 441 F.3d 392, 412-13 (6th Cir.2006) (holding that harmless-error standard applied to claim involving prosecutor’s improper comments).
Thus, before we could grant the writ, we would have to conclude that the alleged error had a “substantial and injurious effect or influence in determining” the outcome of Stumpfs sentencing proceeding. Brecht, 507 U.S. at 637, 113 S.Ct. 1710. The government has the burden of proof in this analysis. Rosencrantz, 568 F.3d at 589.
Three Ohio panels considered whether Stumpf deserved the death penalty after Eastman testified in Wesley’s trial. Each held that the answer was “yes.” Two of the three panels independently weighed Eastman’s testimony. The first of those two, the Ohio Court of Appeals, held: “the evidence supports the conclusion that it was Stumpf, not Wesley, who pulled the trigger that propelled the four bullets into the body of the victim.” It reached that conclusion in spite of Stumpfs argument that Eastman’s testimony cast doubt on his principal-offender designation. The second panel, the Ohio Supreme Court, addressed Eastman’s testimony directly, specifically “findfing] that the testimony of a cellmate during Clyde Wesley’s trial is of minimal credibility,” in the course of its independent consideration of the aggravating and mitigating factors. Stumpf, 512 N.E.2d at 610.
As these Ohio courts held, neither Eastman’s testimony nor the prosecutor’s argument concerning it had a significant impact, much less a “substantial and injurious effect or influence,” Brecht, 507 U.S. at 637, 113 S.Ct. 1710, on the outcome of Stumpfs sentencing proceedings. The record contained ample evidence to support the conclusion that Stumpf, not Wesley, pulled the trigger. Further, after Eastman’s testimony came to light, Stumpf had two more opportunities to argue, in front of panels required to consider the propriety of the death penalty independently, that Eastman’s testimony changed the sentencing calculus. The only thing that Stumpf did not get is something that he is not entitled to: consideration of aggravating and mitigating factors with the evidence construed in his favor — specifically, with the assumption that he was not the principal offender. This is but one view of the evidence. The panels that independently weighed his claim took the other. Thus, even if Stumpf suffered a violation of due process, we cannot say that the violation had a “substantial and injurious effect or influence in determining” the outcome of Stumpfs sentencing proceeding. Ibid.
*753 IV
Stumpf also argues that he received ineffective assistance of counsel. To establish this claim, he must show: (1) deficient performance; and (2) prejudice. Strickland v. Washington, 466 U.S. 668, 687-96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
“[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.” Id. at 690, 104 S.Ct. 2052. Thus, our review of counsel’s performance “must be highly deferential,” and “every effort [must] be made to eliminate the distorting effects of hindsight.” Id. at 689, 104 S.Ct. 2052. Counsel performs deficiently when he makes “errors so serious that [he] was not functioning as the ‘coun sel’ guaranteed the defendant by the Sixth Amendment.” Id. at 687, 104 S.Ct. 2052. “When a convicted defendant complains of the ineffectiveness of counsel’s assistance, the defendant must show that counsel’s representation fell below an objective standard of reasonableness.” Id. at 687-88, 104 S.Ct. 2052.
But “[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.” Id. at 691, 104 S.Ct. 2052. Therefore, to succeed on his ineffective-assistance claim, Stumpf “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694, 104 S.Ct. 2052; see also Wiggins v. Smith, 539 U.S. 510, 535, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (noting that, at sentencing, the relevant prejudice inquiry is whether “had the jury been confronted with this ... mitigating evidence, there is a reasonable probability that it would have returned with a different sentence”).
The gravamen of Stumpfs ineffective-assistance claim is that counsel failed to present three types of evidence at his mitigation hearing: (1) testimony from an independent psychologist about Stumpfs low level of intelligence and his tendency to be a follower, rather than a leader; (2) testimony from jail officers that Stumpf was a model prisoner; and (3) live testimony from a number of family members and friends about Stumpfs background.
At Stumpfs sentencing hearing, defense counsel presented evidence that Stumpf was not intelligent, tended to be a follower, had no significant criminal history, respected women, did not lose his temper, and was not a troublemaker. Stumpfs counsel also elicited live testimony from Stumpfs mother, Stumpfs sister, and nine longtime family friends, and gave the panel an additional sixty “questionnaires,” filled out by Stumpfs friends and family, tending to show that Stumpf was a gentle person without a temper who respected women.
Perhaps counsel could have presented a more vivid mitigation case had he followed the path that Stumpf now.suggests. Perhaps not. Counsel, through extensive, often-overlapping testimony, made the very points that Stumpf alleges an independent psychiatrist would have made. Counsel presented more than ten character witnesses and sixty “questionnaires” to give the factfinders a vivid image of Stumpfs background and personality. And, although it is true that counsel did not call prison officers to testify about Stumpfs in-prison behavior, testimony about a prisoner’s behavior after committing murder is, at best, minimally probative of his general temperament before committing the crime. In light of the extensive character testimony that counsel produced, it was reason *754 able not to call Stumpfs prison guards as witnesses. Counsel’s representation was not objectively unreasonable within the meaning of Strickland.
But even if counsel were remiss in one of the three areas that Stumpf highlights, Stumpf has not shown “a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. The panel had before it evidence of each mitigating factor that Stumpf claims counsel should have presented. The panel heard that Stumpf was not particularly intelligent and was more of a follower than a leader, it heard that he had no criminal record, and it heard that he respected women, did not lose his temper, and was not a troublemaker. “The sentencing [panel] was thus ‘well acquainted’ with [Stumpfs] background and potential humanizing features. Additional evidence on these points would have offered an insignificant benefit, if any at all.” Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 388, 175 L.Ed.2d 328 (2009).
Stumpfs counterargument is unpersuasive. He suggests that, because the sentencing panel found only two mitigating factors — youth and lack of a criminal history — there is a reasonable probability that his sentence would have been different, had counsel presented more or different evidence.[9] This argument suffers from a fatal flaw: the quantity of evidence that a lawyer produces is not necessarily determinative of the quality of his presentation. Here, counsel painted a vivid picture of Stumpf for the factfinders through witness testimony from Stumpfs probation officer, former teachers, family, and friends. That picture was not strong enough to blot out the enormity of Stumpfs crime. Nothing about the evidence that Stumpf suggests counsel should have presented was so striking that there is a reasonable probability that the panel would have chosen a different sentence. Stumpfs ineffective-assistance claim fails.
V
Stumpf has had an extraordinary amount of process — and certainly all of the process that he was due. He was able to argue in front of three separate panels, two of which had an obligation to weigh the propriety of the death penalty independently, that the State’s different arguments at different proceedings about evidence fully presented fundamentally altered his sentencing calculus. That he lost does not mean that he suffered unfairness, much less the kind of fundamental unfairness that would warrant our setting aside his sentence under the rubric of the Due Process Clause. The judgment of the district court is AFFIRMED.

. The Raven was never recovered. It was clear, however, that the .25-caliber Armi fired only one round, and that all of the other bullets found at the scene were fired from the same gun.

. Stumpf was twenty-three at the time of the crime.

. At pages 760-62, Judge Daughtrey seems distressed that Stumpf's original sentencing hearing was conducted "without the benefit of any eyewitness testimony proving that Stumpf was the trigger man....” Of course, the most percipient eyewitness, Mrs. Stout herself, was unfortunately deceased (for reasons not the fault of the prosecution).

.Justice Souter does use the term "witness it had vouched for” in reference to Eastman, Bradshaw v. Stumpf, 545 U.S. 175, 189, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005) (Souter, J., concurring), and perhaps that is the source of Judge Daughtrey’s repeated use of that term. See J. Daughtrey Dissent, at 757-58, 759-60, 761-62. However, of course, it would have been improper and indeed probably reversible error for the state to have "vouched for” the witness it presented. See *745 United States v. Reid, 625 F.3d 977, 982 (6th Cir.2010).

. The other judge, of course, had heard Wesley's and Eastman’s testimony, since he presided at Wesley's trial.

. Judge White faults the Ohio Supreme Court for disregarding the alleged reality that the proceeding before the two judges who refused to vacate Stumpf's sentence amounted to a resentencing, as opposed to a motion for a new trial. J. White Dissent, at 763. Accordingly, she posits that Stumpf's sentence must be invalid because Ohio law requires the unanimous vote of a jury or a three-judge panel in order to impose death. Ohio Rev. Code § 2929.03(D)(2). Stumpf has not presented this argument to this court, and for good reason: it does not present a question of federal law. The legal nature of Stumpf's motion is purely a question of Ohio law, over which the Ohio Supreme Court is the ultimate arbiter. See Bradshaw v. Richey, 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) ("We have repeatedly held that a state court’s interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.”). Stumpf presented this very question to the state supreme court, which determined that, under the laws of Ohio, his motion was akin to a motion for a new trial and thus amenable to adjudication by two members of the three-judge panel. Stumpf, 512 N.E.2d at 608-09. Even if we were to assume arguendo that the Ohio Supreme Court misinterpreted its own law (a highly dubious assumption), such an error could not serve as a basis for federal habeas relief. See Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.” (internal quotation marks omitted)).

. Two Justices filed separate concurring opinions.

. There axe two species of due-process claims in criminal cases. State action that "shocks the conscience” violates the Due Process Clause's substantive component. Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (Frankfurter, J.). State action that deprives a defendant of a fundamentally fair trial violates the Due Process Clause’s procedural component. Medina v. California, 505 U.S. 437, 443, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) (internal quotation marks and alterations omitted). Neither Stumpf, nor our prior opinions, nor even the Supreme Court majority, specifies which kind of violation allegedly occurred here. We, like Justice Souter, "understand Stumpf to claim that it violates the basic due process standard, barring fundamentally unfair procedure, to allow his death sentence to stand.” Stumpf, 545 U.S. at 188, 125 S.Ct. 2398 (Souter, J., concurring).

. Stumpf's counsel argued for other mitigating factors, including: (1) it was unlikely that the offense would have occurred without Wesley's influence; (2) Stumpf was not the principal offender; and (3) other relevant factors, including the fact that Wesley was also being prosecuted for the murder.