NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0381n.06

Case Nos. 24-1045/1272

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

FILED
Jul 30, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| | ) | |
| TEEAUNA WHITE (24-1045); ROBIN | ) | O P I N I O N |
| HERNDON (24-1272), | ) | |
| Defendants - Appellants. | ) | |

Before: BOGGS, McKEAGUE, and MATHIS, Circuit Judges.

**McKEAGUE, Circuit Judge.** The Money Gang Meal Clique was a large-scale drug-trafficking organization. The organization's leader, Maurice McCoy, distributed kilogram quantities of cocaine and heroin throughout the United States, and he received hundreds of thousands of dollars in cash in return. To disguise the source of the drug proceeds, he relied on Teeauna White, his girlfriend, and Robin Herndon, his cousin. White collected money from the organization's members and set up bank accounts that received numerous cash deposits. She then used those funds to finance her luxurious lifestyle. Herndon agreed to buy an eight-bedroom house on White and McCoy's behalf. He paid for the house using dozens of cash deposits that he obscured by a complex web of financial transactions.

The government charged White and Herndon with conspiracy to commit money laundering. After a 13-day trial, a jury convicted both defendants. On appeal, White challenges the validity of a search warrant and several rulings by the district court at trial. Herndon argues that

there was insufficient evidence to support his conviction. Because these claims fail, we **AFFIRM** the district court's judgments.

## I.

## A.

For years, the Money Gang Meal Clique supplied large quantities of drugs throughout the United States. Specifically, the organization's couriers transported bricks of cocaine and heroin from California to Alabama, Florida, Georgia, Indiana, Maryland, and Michigan. After delivering the drugs to regional distributors, the couriers transported tens of thousands of dollars in cash back to California.

McCoy led the Money Gang Meal Clique. As the "financial backer and drug supplier" for the organization, he purchased the drugs wholesale, set their price, and oversaw a vast network of couriers and regional distributors. Trial Tr. Vol. II.B, R.874 at PageID 11413. The regional distributors operated on consignment: they received the drugs from McCoy one week, and they sent the proceeds from the sale of those drugs back to McCoy the following week.

White was McCoy's girlfriend. They lived in the same house and had a child together. They also controlled several bank accounts. Many of the accounts were named after businesses owned by the couple, including Money Gang Meal Clique (a record label), Another Level (a recording studio), and Pretty Pockets (a clothing line).[1] Almost immediately after the accounts opened, they received an influx of cash deposits. Between August 2016 and December 2017, the business accounts' cash deposits totaled over $230,000. However, no single cash deposit exceeded $10,000.[2]

---

[1] "Money Gang Meal Clique" was the name of both McCoy's record label and the drug-trafficking organization.

[2] At trial, a government witness explained that federal law requires financial institutions to file a Currency Transaction Report (CTR) with the Financial Crimes Enforcement Network when an individual

At trial, the government presented evidence that at least some of these deposits were drug proceeds. Multiple witnesses also testified that White handled the organization's cash on at least two occasions. First, a regional distributor for the organization brought at least $100,000 to McCoy during a trip to California in October 2015; the distributor gave several bundles of cash to McCoy, and McCoy let White take the money to another room. Second, one of the organization's couriers transported drug proceeds from Michigan to California in June 2017. Here too, the courier gave the money to McCoy, and McCoy passed the money to White.

The government also presented evidence that White knew—or deliberately ignored—that the cash came from the drug-trafficking organization. In June 2017, White traveled with McCoy to visit the organization's stash house in Novi, Michigan. A few weeks later, White texted McCoy about her finances. McCoy complained that White had been out of work for over a year; White replied, "I thought me helping u with the label & music was some effort. *Keeping a system that shows income u do make*." Trial Tr. Vol. VII, R.877 at PageID 11880 (emphasis added). After law-enforcement officers raided the Novi stash house, White went to the recording studio where members of the organization discussed what happened. Evidence obtained from White's Apple iCloud account revealed that she searched for news articles about the raid, and that she warned her sister to "watch what [she] say[s]" because her sister's phone "might be tapped now." Trial Tr. Vol. X, R.742 at PageID 8337–38.

**B.**

Despite reporting minimal income on her tax returns, White made several luxury purchases while McCoy ran the drug-trafficking organization. In January 2017, she expressed interest in an eight-bedroom house in a gated community in Moreno Valley, California. The list price for the house was $575,000. When White toured the house, she told the real-estate agent that McCoy did

---

deposits over $10,000 in cash in an account in a single day. The CTR captures identifying information about the person conducting the transaction, including the person's name, date of birth, and Social Security number.

not qualify for a traditional loan. She explained that Herndon, McCoy's cousin, would purchase the house instead. The purchase agreement for the house listed Herndon's limited liability company as the buyer, but McCoy paid the initial $5,000 deposit for the house.

After signing the purchase agreement, Herndon obtained a $374,500 "hard money loan" from a third-party lender. He and his colleague then opened eleven bank accounts at five financial institutions within a four-day span. These accounts soon received a steady stream of cash deposits, each less than $10,000.[3] Before the closing date to purchase the house, the accounts received approximately 50 cash deposits totaling more than $146,000. Then, over a two-week period, Herndon shuffled the deposits between accounts in a convoluted web of bank transfers. Eventually, the accounts funneled over $114,000 to a central account associated with Herndon's limited liability company. Herndon then used the central account to make the down payment on the house. After the closing, the real-estate agent gave the house keys to White.

In July 2017, Herndon traveled from California to Baltimore at McCoy's request. While there, Herndon met a courier for the drug-trafficking organization in a parking lot, and the courier handed him $10,000 in cash. Herndon then deposited $8,250 in cash into his ex-wife's bank accounts. Later that day, Herndon traveled back to California on the same flight as the courier and another member of the drug-trafficking organization; all three tickets were part of the same reservation. After his return, Herndon deposited an $8,000 check from his ex-wife into his limited liability company's central account.

More than two years later—after the house was paid off in full—Herndon spoke with law-enforcement officers. He initially explained that he used his own cash savings to make the down payment for the house; he later admitted that McCoy gave him $100,000 in cash, concealed in a bag, to fund the down payment. Herndon noted that "he did not want to know where the money was from." Trial Tr. Vol. IX, R.741 at PageID 8097. When asked about the balance on the hard-

---

[3] An account associated with Herndon's son also received a cash deposit of $9,000.

money loan, Herndon claimed that his ex-girlfriend paid off the loan because she wanted to get into the real-estate business.[4] Herndon could not explain why paying off his loan would improve her real-estate prospects.

## C.

The government filed charges against 18 individuals associated with the drug-trafficking organization, including White and Herndon. After the other defendants pleaded guilty, the government filed a superseding indictment against White and Herndon, charging them with one count of conspiracy to commit money laundering. *See* 18 U.S.C. § 1956(h).

Before trial, White moved to suppress evidence obtained from two search warrants: one for her iCloud account, and one for her house. White claimed that the affidavits used to obtain the warrants contained "material mischaracterizations, falsehoods, and omissions" and relied on "confidential sources of information of unproven reliability." Br. in Supp. of Mot. to Suppress, R.477 at PageID 3472. She also requested an evidentiary hearing to assess "the validity of the affiant[s'] averments." *Id.* at PageID 3491; *see Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The district court denied her motion to suppress and her request for a *Franks* hearing.

White and Herndon proceeded to trial. The government presented testimony from several witnesses, including three members of the drug-trafficking organization, the real-estate agent who sold the house to Herndon, and several Drug Enforcement Administration (DEA) special agents who investigated the organization. On the thirteenth day of trial, the jury convicted both defendants. The district court sentenced White to 42 months in prison and Herndon to 48 months in prison. Both defendants timely appealed.

---

[4] From April 2017 to September 2017, Herndon's ex-girlfriend's bank account received 41 cash deposits totaling over $336,000.

**II.**

White appeals the district court's denial of her motion to suppress evidence obtained from two search warrants. She then raises two issues related to witness testimony: the first involves an evidentiary ruling, and the second relates to the government's pretrial expert-witness disclosures. Finally, she alleges that a prosecutor committed misconduct by eliciting false testimony and that the court improperly criticized her counsel's demeanor and professionalism. None of these claims are persuasive.

**A.**

White claims that the district court erred by denying her motion to suppress the evidence obtained from searches of her iCloud account and house. She further argues that the court should have held a hearing to assess the constitutionality of the search warrants (i.e., a "*Franks* hearing") because the accompanying affidavits omitted exculpatory information about her legitimate business activities. When reviewing a district court's denial of a motion to suppress and a defendant's request for a *Franks* hearing, we review the court's factual findings for clear error and its legal conclusions de novo. *See United States v. Bateman*, 945 F.3d 997, 1007–08 (6th Cir. 2019) (citation omitted).

**1.**

We first turn to the search warrant for White's iCloud account. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation[.]" U.S. Const. amend. IV. To determine whether there is probable cause for a search warrant, the issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). This standard "is not a high bar." *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)). When evaluating a probable

cause determination, district courts must exercise "great deference" and should only overturn the decision "if the issuing judge arbitrarily exercised the judge's authority." *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir.) (en banc) (cleaned up), *cert. denied*, 145 S. Ct. 603 (2024). In our review, we must be "mindful of the deference the district court was required to afford the issuing judge's decision to authorize the warrant." *Id.* We look only at "the information contained within the four corners of the affidavit," and "line-by-line scrutiny of the underlying affidavit is improper[.]" *United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018) (citations omitted).

A defendant may challenge the constitutionality of a search warrant by showing that the affiant "knowingly and intentionally, or with reckless disregard for the truth," included a false statement in the affidavit that was "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–56. The defendant may also argue that the affiant omitted information. *See United States v. Davis*, 84 F.4th 672, 681–82 (6th Cir. 2023), *cert. denied*, 145 S. Ct. 222 (2024). However, an omission is "less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997); *see also Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (noting that a rule requiring affiants to include all potentially exculpatory evidence in an affidavit "places an extraordinary burden on law enforcement officers"). Thus, a defendant who requests a *Franks* hearing because of a purported omission must clear a "higher bar." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008). The defendant must make a "substantial preliminary showing" that the affiant, with the requisite culpability, made a "material omission [that] is necessary to the probable cause finding[.]" *United States v. Young*, 847 F.3d 328, 348–49 (6th Cir. 2017) (citation omitted).

White claims that the affidavit about her iCloud account is constitutionally deficient because (1) the affidavit did not establish the reliability of a confidential informant who connected White to the drug-trafficking organization; (2) the affidavit's references to White's

7

communications with members of the drug-trafficking organization lacked sufficient context; and (3) the affidavit omitted evidence showing that White operated legitimate businesses. We disagree.

First, White questions the reliability of one of the five confidential informants cited by the affidavit. However, "information received from an informant whose reliability is not established may be sufficient to create probable cause when there is some independent corroboration by the police of the informant's information." *United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000); *see also United States v. Owens*, 742 F. App'x 1004, 1006–07 (6th Cir. 2018) (concluding that an informant's tip was reliable because it was sufficiently corroborated). The information provided by this confidential informant—including the assertion that White knew about the drug-trafficking organization—was corroborated by the other informants and an independent investigation by the DEA. *See* Order Den. Mot. to Suppress, R.520 at PageID 4117. Because there was sufficient corroboration to establish the informant's reliability, it was not improper to consider that evidence when evaluating whether there was probable cause. *See United States v. Abdalla*, 972 F.3d 838, 849–50 (6th Cir. 2020).

Second, White claims that she had innocuous reasons for communicating with members of the drug-trafficking organization, and thus the affidavit's reference to those conversations was "fundamentally misleading." White Br. at 52. For example, she notes that she and another member of the drug-trafficking organization were "high school sweethearts," yet the affidavit suggested that they would have communicated only about the drug-trafficking organization. *Id.* But the affidavit explicitly cited their personal conversations, including a birthday message and a discussion about hotel reservations. In any event, White's argument is ultimately an attempt to "litigate the issue of guilt or innocence on a motion to suppress." *United States v. Tagg*, 886 F.3d 579, 589 (6th Cir. 2018) (recognizing that law enforcement "need not rule out a suspect's innocent explanation for suspicious facts in order to establish probable cause" (internal quotation marks omitted)). Probable cause, however, "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 243 n.13.

Third, White argues that the affidavit made "misleading material misrepresentations" about her businesses' bank accounts. White Br. at 54. Specifically, she alleges that the affidavit omitted the fact that these accounts were used by "ongoing businesses that generate revenue and incur expenses." *Id.* (citation omitted). However, the district court concluded that even if the affidavit included this information, "the affidavit still detailed suspicious transaction histories . . . that would have supported probable cause to believe that they were being used to launder money." Order Den. Mot. to Suppress, R.520 at PageID 4102 (citing *United States v. Bencs*, 28 F.3d 555, 562 (6th Cir. 1994) (noting that a defendant cannot avoid liability for money laundering "by commingling assets or otherwise disguising the source of his funds")). Because there would still be sufficient evidence to support "a finding of probable cause . . . if the omitted material were considered to be a part of" the affidavit, White has not met the "higher bar" for a *Franks* hearing. *Fowler*, 535 F.3d at 415.

**2.**

We next consider the affidavit supporting the search warrant for White and McCoy's house. White raises the same arguments as she did for the iCloud affidavit, but she further claims that the evidence contained in the affidavit for the house was "stale." As she correctly notes, "[p]robable cause cannot be supported by stale information." *United States v. Pointer*, No. 22-1082, 2022 WL 17820539, at *6 (6th Cir. Dec. 20, 2022). The information contained in a warrant is stale if it could establish probable cause "at some point in the past, [but] is now insufficient as to evidence at a specific location." *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006). To determine whether information is stale, we look to more than just the length of time between the events described in the affidavit and the application for the warrant. *Id.* Instead, we consider (1) whether the type of crime is "a chance encounter or continuous in nature"; (2) whether the person suspected of criminal activity is "nomadic or entrenched"; (3) whether the evidence sought is "perishable or enduring"; and (4) whether the location of the search "is a mere forum of

convenience or secure operational base." *United States v. Hills*, 27 F.4th 1155, 1192 (6th Cir. 2022) (citation omitted).

Like the district court, we conclude that the information contained in the affidavit was not stale when law-enforcement officers applied for the search warrant in May 2019. The affidavit explained that the drug-trafficking organization operated until at least March 2019, when two of the organization's couriers were arrested with several kilograms of heroin. A few weeks before law enforcement applied for the warrant—which sought financial records, drug proceeds, and luxury items—White posted on her Instagram account an image of herself holding large quantities of cash. A confidential informant reported that McCoy typically kept drug proceeds in his residence, and as of May 2019, both White and McCoy consistently resided at the house. In short, the evidence contained in the affidavit was not stale, and it was certainly sufficient to establish probable cause. *See United States v. Rogers*, 861 F. App'x 8, 18 (6th Cir. 2021) (concluding that an affidavit was not stale, in part because the warrant was for the defendant's residence, there was no indication that the defendant moved, and the warrant sought durable and nonperishable items).

**B.**

White next challenges a probation officer's testimony that McCoy had a prior conviction for conspiracy to possess with intent to distribute cocaine and cocaine base. In her view, this reference to McCoy's criminal history amounted to improper character evidence and was unduly prejudicial to her. The district court denied White's motion to exclude the evidence before trial, and it overruled her objection to the evidence during trial. We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Sadrinia*, 134 F.4th 887, 893 (6th Cir. 2025).

Federal Rule of Evidence 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). "Evidence that a defendant sold drugs [several] years before, for example, is not admissible to prove that he did

so . . . in the case at hand." *Sadrinia*, 134 F.4th at 893. So, as White correctly notes, the government could not use McCoy's prior conviction to prove that McCoy "has a propensity for committing drug crimes." White Br. at 24. However, the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); *United States v. Blakeney*, 942 F.2d 1001, 1018 (6th Cir. 1991) (noting that Rule 404(b)(2)'s "list of permissible purposes for admitting 'bad acts' evidence is not exhaustive"). If the government offers the evidence for a permissible purpose, then the court must evaluate whether "the probative value of the evidence [is] substantially outweighed by the danger of unfair prejudice to the defendant." *United States v. Whitlow*, 134 F.4th 914, 925 (6th Cir. 2025) (citing Fed. R. Evid. 403). In reviewing the admissibility of evidence under Rule 404(b) and Rule 403, we afford district courts "broad discretion." *United States v. Clemis*, 11 F.3d 597, 600 (6th Cir. 1993) (citation omitted).

First, the government presented McCoy's prior conviction as evidence for a permissible purpose under Rule 404(b). The government never claimed that McCoy's conviction was evidence that McCoy led the drug-trafficking organization while he was in a relationship with White, as it relied on a plethora of other evidence—including testimony by multiple cooperating witnesses and DEA special agents—to prove that fact. Instead, the government argued that White *knew* about McCoy's conviction, and thus "ignored the high probability that the large amounts of unexplained cash in her [bank] accounts . . . were criminally derived." Resp. to Defs. Mots., R.699 at PageID 6845; *see also* Jury Instructions, R.719 at PageID 7697. To support this claim, the government offered evidence that, in the same period in which White's businesses' bank accounts received dozens of cash deposits under $10,000, White mentioned McCoy's conviction during her discussion with McCoy's probation officer. *See* Trial Tr. Vol. XI, R.743 at PageID 8558; Trial Ex. 63.2, R.924-2 at PageID 14440–42.

Second, the probative value of the evidence is not substantially outweighed by any unfair prejudice to White. Rule 403's balancing test "is strongly weighted toward admission." *United*

11

*States v. Householder*, 137 F.4th 454, 489 (6th Cir. 2025) (per curiam) (citation omitted). When the district court admits evidence under Rule 403, this court "look[s] at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004) (alteration in original) (citation omitted). Here, the district court concluded that "whether White knew of McCoy's conviction when the alleged drug money was moving through her bank accounts" was "probative of her knowledge of and participation in the . . . money laundering scheme." Order, R.708 at PageID 6937. It further noted that "the prejudicial nature" of McCoy's conviction "d[id] not seem to reflect upon [White] in any way," Trial Tr. Vol. V, R.875 at PageID 11550, and the evidence was "hardly any more prejudicial than other evidence of McCoy's participation and leadership of" the drug-trafficking organization. Order, R.708 at PageID 6937. Because the court has "very broad discretion" to evaluate the evidence under Rule 403, we see no reason to second-guess its "reasoned determination." *United States v. Vance*, 871 F.2d 572, 576–77 (6th Cir. 1989) (internal quotation marks omitted).

To mitigate any prejudicial effect of McCoy's conviction, the court agreed to provide a limiting instruction to the jury. But White claims that the district court "fail[ed] to read [the] limiting instruction properly." White Br. at 26. In her view, the court was supposed to instruct the jury that McCoy's conviction should only be used to decide "whether Ms. White or Mr. Herndon knew or deliberately ignored *a* high probability that the property involved in a financial or monetary transaction" represented the proceeds of an unlawful activity, but it ultimately instructed the jury that the evidence could only be used to decide "whether Ms. White or Mr. Herndon knew or deliberately ignored *the* high probability that the property involved in a financial or monetary transaction" represented the proceeds of an unlawful activity. White Br. at 26–27.

Contrary to White's suggestion, the district court did not misread the agreed-upon jury instructions. *Compare* Jury Instructions, R.719 at PageID 7697, *with* Trial Tr. Vol. XIV, R.880 at PageID 12687–88. Nor did White object to the instruction's use of the definite article "the" instead

of the indefinite article "a" until after the jury retired to deliberate. Thus, we review White's challenge to the instruction for plain error. *See* Fed. R. Crim. P. 30(d), 52(b); *United States v. Tragas*, 727 F.3d 610, 616 (6th Cir. 2013). To establish plain error, White must show there was "an error . . . that was obvious or clear" and affected both her "substantial rights" and "the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Bauer*, 82 F.4th 522, 530 (6th Cir. 2023). White cannot meet that demanding standard for two reasons. First, regardless of which article the instruction used, it still communicated that the jury should not consider McCoy's conviction as propensity evidence. Second, a separate instruction correctly explained that White deliberately ignored the "unlawful aim of the conspiracy" only if she "was aware of *a* high probability that a transaction was one in criminally derived property" and she "deliberately closed . . . her eyes to what was obvious." Trial Tr. Vol. XIV, R.880 at PageID 12699–700 (emphasis added). Because there was no plain error, we decline to disturb the jury's verdict.

## C.

White also argues that the district court erroneously admitted opinion testimony from DEA Special Agent Jeremy Fitch. Specifically, she claims that Special Agent Fitch's testimony—in which he opined about how drug traffickers typically use cell phones—exceeded the scope of the government's pretrial expert-witness disclosure. In her view, this purported discovery violation warrants reversal. We review the district court's decision to admit Special Agent Fitch's testimony for an abuse of discretion. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007).

At the time of trial, the Federal Rules of Criminal Procedure required the government to disclose, upon request, "a complete statement of all opinions that the government will elicit from" an expert witness during its case-in-chief. Fed. R. Crim. P. 16(a)(1)(G) (2022). If the government violates its disclosure obligations under Rule 16, then "[c]ourts should impose the least severe remedy available to cure [any] prejudice." *United States v. Collins*, 799 F.3d 554, 573 (6th Cir. 2015) (internal quotation marks omitted). Thus, the "suppression of evidence must be viewed as

an undesirable remedy reserved for cases of incurable prejudice or bad faith conduct[.]" *United States v. Maples*, 60 F.3d 244, 247 (6th Cir. 1995).

Before trial, the government informed White that Special Agent Fitch would "testify about common characteristics of large drug trafficking organizations." Expert Witness Disclosure, R.920 at PageID 14374. The government then provided a bulleted list of ten opinions that Special Agent Fitch could provide during his testimony, including:

- Drug traffickers will commonly use code words to describe their criminal activity. . . .

- Those involved in the drug trade commonly use multiple cell phones [] and change phones and numbers regularly to conceal their illegal activities. Drug traffickers commonly use "burner phones," e.g. phones that are used for a short period of time or for a drug transaction before they discard them. It is common for persons involved in drug trafficking to establish phone contracts in fictitious names or names of other individuals.

*Id.* at PageID 14374–75. According to White, this disclosure did not address Special Agent Fitch's trial testimony that "people involved in drug trafficking [1] make short phone calls, [2] carry multiple phones, [3] have short contact lists, [4] have specific phones for specific people, and [5] change their phones regularly." White Br. at 31–32.

The government's pretrial disclosure provided ample notice of Special Agent Fitch's opinion testimony. First, Special Agent Fitch testified that drug traffickers typically have "very brief" phone conversations using "coded words," typically to arrange in-person meetings. Trial Tr. Vol. IX, R.741 at PageID 8185. This testimony aligns with the government's disclosure that drug traffickers use "code words" and "burner phones" to conduct their operations. Expert Witness Disclosure, R.920 at PageID 14374–75. Second, Special Agent Fitch explained that drug traffickers sometimes "carry multiple phones," "frequently change[]" their phones, and use one phone "for a set of customers." Trial Tr. Vol. IX, R.741 at PageID 8180. Again, the government provided notice that "[t]hose involved in the drug trade commonly use multiple cell phones," "change phones and numbers regularly," and use phones "for a short period of time or for a drug transaction before they discard them." Expert Witness Disclosure, R.920 at PageID 14375. Third,

Special Agent Fitch did not mention "short contact lists" during the government's direct examination. When discussing how drug traffickers use "burner" phones, he briefly mentioned that "the number of contacts within each phone may vary." Trial Tr. Vol. IX, R.741 at PageID 8180. This too falls within the government's disclosure that drug traffickers use burner phones for a short period of time. In short, the government adhered to its Rule 16 discovery obligations.[5]

Even if Special Agent Fitch's testimony exceeded the government's pretrial disclosure, White would not be entitled to relief. When deciding whether to suppress an expert witness's testimony because of a discovery violation, courts should consider "the degree of prejudice, if any, to the defendant." *Maples*, 60 F.3d at 247. White suffered no prejudice here, as the jury heard nearly identical testimony earlier in the trial. DEA Special Agent Michael Reamer explained that drug traffickers typically "have [a] small amount of contacts on each phone to keep . . . their narcotics trafficking contacts separate from regular contacts." Trial Tr. Vol. IV, R.713 at PageID 7252. He further explained that "[a] burner phone is a disposable phone or a phone that's used for a short amount of time and then discarded." *Id.* at PageID 7257. Allen Hayward, a regional distributor in the drug-trafficking organization, also testified that he used multiple phones, changed numbers often, and communicated in code. Because Special Agent Fitch's testimony was largely duplicative of prior testimony, any minor defect in the government's pretrial disclosure would not warrant reversal.

**D.**

Next, White claims that the government violated her right to due process by eliciting false testimony from a cooperating witness. We review this claim de novo. *Collins*, 799 F.3d at 586–87 (citing *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011)).

---

[5] In her reply brief, White claims for the first time that the government's disclosure contained only "general categories of testimony," White Reply Br. at 4, which purportedly fails to satisfy Rule 16's requirement of "a *complete statement* of all opinions[.]" Fed. R. Crim. P. 16(a)(1)(G)(iii) (2022) (emphasis added). But "[w]e will generally not hear issues raised for the first time in a reply brief," and we decline to do so here. *United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001).

It is well established that "a conviction obtained through use of false evidence" violates a defendant's due process rights. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The same is true when the government, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*; *see Stumpf v. Robinson*, 722 F.3d 739, 750 (6th Cir. 2013). A witness's false testimony amounts to a denial of due process when (1) the statement was actually false, (2) the prosecution knew the statement was false, and (3) the statement was material. *Brooks v. Tennessee*, 626 F.3d 878, 894–95 (6th Cir. 2010) (citing *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998)); *see also Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009) (applying the same test to a failure-to-correct claim). The statement at issue "must be indisputably false rather than merely misleading." *Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009) (internal quotation marks omitted); *see also United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) ("The burden is on the defendant[] to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.")

White contends that Hayward, a cooperating witness, falsely testified during redirect examination that the government "could no longer put him in jeopardy of going to jail since he had already been sentenced under his cooperation agreement." White Br. at 28. She claims that this statement is false because if Hayward did *not* testify, he could still go to jail for contempt of court. By failing to correct this testimony, White accuses the prosecutor of either "intentional dishonesty, or pretty wild ignorance." *Id.* at 29. Either way, White asserts that the prosecutor's line of questioning is "plainly misconduct." *Id.* at 31.

White is plainly wrong. During cross examination, White's counsel asked Hayward if he knew the potential consequences if he failed to testify. Hayward responded, "[i]f I'm subpoenaed, I have to be here." Trial Tr. Vol. III, R.712 at PageID 7150. Hayward then agreed that if he failed to appear, he could be "locked up" and "held in contempt," which would violate the terms his supervised release. *Id.* at PageID 7150–51. He also mentioned that he "wasn't aware that [he] was facing [] further criminal charges for anything." *Id.* at PageID 7152. Then, on redirect examination,

16

the prosecutor asked Hayward if the government could "do anything" to him if he did not appear in court. *Id.* at PageID 7161. Hayward answered: "No, not criminally. I know I was subpoenaed to court so I could have been held in contempt of court, but that's nothing other than that." *Id.* at PageID 7163.

When read in context, Hayward's answer to the government's question is not "indisputably false." *Akrawi*, 572 F.3d at 265 (citation omitted). By that point, the government had offered Hayward's cooperation agreement into evidence, and White's counsel repeatedly asked him about its terms. On cross examination, Hayward conceded that he could be held in contempt and jailed if—hypothetically—he failed to appear in court. Continuing the hypothetical on redirect examination, the prosecutor asked whether he *thought* the government could enact any other punishment; Hayward reiterated his belief that there was "nothing other than" contempt. Trial Tr. Vol. III, R.712 at PageID 7162–63.[6] Put simply, the government's follow-up questions about Hayward's understanding of what could happen in the hypothetical scenario described by White's counsel does not amount to the elicitation of false testimony. Thus, there was no due process violation.

### E.

Finally, White attacks the district judge's impartiality and demeanor at trial. Specifically, White alleges that the judge engaged in "repeated verbal attacks, dismissals, and personal criticisms" of White's counsel, "exhibited a pattern of overt impatience and condescension toward [White's] counsel," "became increasingly hostile," was "dismissive and undignified" during a colloquy with White's counsel, and led the jury to believe "that [White's] case is not worthy." White Br. at 37–40, 44. In her view, the judge's purported bias—and his failure to recuse himself—

---

[6] White also argues that, in addition to contempt, Hayward could be charged with perjury. But that claim ignores the premise of the question: Hayward could not perjure himself "if [he] did not come in [to court] and testify." Trial Tr. Vol. III, R.712 at PageID 7162.

violated her right to due process.[7] White raises a serious allegation against a sitting district judge. We have reviewed the entire trial transcript, and after reviewing her claim in the context of the full trial, we conclude that it is without merit.

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955); *see also Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002). Under the Fifth Amendment's Due Process Clause, "recusal is required when, objectively speaking, the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *United States v. Liggins*, 76 F.4th 500, 505 (6th Cir. 2023) (internal quotation marks omitted). But this standard only establishes "a constitutional floor, not a uniform standard." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In most cases, the question of whether a judge should recuse himself is "answered by common law, statute, or the professional standards of the bench and bar." *Id.*; *see also Williams v. Anderson*, 460 F.3d 789, 814 (6th Cir. 2006) ("Although the Constitution generally does not require disqualification on the basis of bias and prejudice, federal and state statutes may require a judge to recuse him or herself.").

Accordingly, White points to a federal statute that provides that a district judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). A judge's conduct at trial may constitute improper bias or partiality under § 455(a) if he "display[s] a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also id.* at 551 ("A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to

---

[7] In a single parenthetical, White's principal brief also references her "Sixth Amendment fair trial right[]." White Br. at 37. But the remainder of her brief—and all of the cases cited therein—refer only to her Fifth Amendment right to due process and the judge's statutory obligation to recuse himself. *See* U.S. Const. amend. V; 28 U.S.C. § 455. Thus, she waived any argument relating to her Sixth Amendment rights. *See Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013) ("[A]rguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").

display clear inability to render fair judgment."). However, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* at 555; *see also United States v. Adams*, 722 F.3d 788, 838 (6th Cir. 2013) (noting that judicial statements "amount[ing] to criticism and disapproval of defendants" do not satisfy the "'extreme' bias or prejudice standard under *Liteky*"). Mere "expressions of impatience, dissatisfaction, annoyance, and even anger" are insufficient. *Liteky*, 510 U.S. at 555–56. And, as relevant here, "[a] judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556. In other words, a defendant who argues that a judge should be disqualified because of his conduct at trial "faces an uphill battle." *Burley v. Gagacki*, 834 F.3d 606, 616 (6th Cir. 2016). Because White never asked the judge to recuse himself, we review her claim of judicial bias for plain error. *See United States v. Bankston*, 820 F.3d 215, 233 (6th Cir. 2016); Fed. R. Crim. P. 52(b).

Throughout her briefing, White cites several exchanges that purportedly illustrate the judge's "antagonistic treatment" of her counsel during trial. White Br. at 37. First, White claims that the judge was impatient and condescending toward her counsel in front of the jury. She cites two examples. In one, the judge asked her counsel to rephrase a question during cross examination; in the other, the judge asked her counsel not to spend a lot of time discussing a government exhibit because she had "made the point several times." White Br. at 39 (quoting Trial Tr. Vol. III, R.712 at PageID 7126). Even if we accept White's premise that the judge was "stern and short-tempered" during these interactions, they are paradigmatic examples of "ordinary efforts at courtroom administration" that do not require recusal. *Liteky*, 510 U.S. at 556.

Second, White's principal brief references four instances in which the judge became "increasingly hostile" during the 13-day trial. White Br. at 39. But sporadic "hostile" remarks by a judge to a party's counsel are typically not indicative of bias or prejudice. *Liteky*, 510 U.S. at 555. And in this case, the judge's apparent frustration with White's counsel must be placed in

context. Before opening statements, the judge remarked that he had not encountered a criminal case "where the attorneys have had such difficulty reaching agreement with respect to . . . fundamental matters" such as the elements of the charged offense. Trial Tr. Vol. II.B, R.874 at PageID 11330. Throughout the trial, there were numerous instances in which White's counsel interrupted the judge. She also repeatedly violated the judge's instructions by making speaking objections in front of the jury. And she exceeded the projected length of her witness examinations multiple times. In light of White's counsel's behavior during trial, the judge's annoyance or frustration is "within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Liteky*, 510 U.S. at 556; *see also Gordon v. Lafler*, 710 F. App'x 654, 664–65 (6th Cir. 2017) (concluding that the district judge's response to "defense counsel's obstinate behavior," even if "inappropriate and lacking in tact," did not deprive the defendant of due process); *United States v. Johnson*, 182 F. App'x 423, 433 (6th Cir. 2006) (stating that "the district court's annoyance at defense counsel's disrespectful behavior" does not amount to judicial bias).

In her reply brief, White doubles down on her claim that the judge displayed "plain deep-seated antagonism." White Reply Br. at 6. Across nearly 3,000 pages of trial transcripts, she points to only six excerpts in which the judge either interrupted her counsel or purportedly showed "favoritism" to the government. But here too, White's examples fall comfortably within the bounds of "ordinary efforts at courtroom administration." *Liteky*, 510 U.S. at 556. We also note that White's reply brief references material *outside* of the record. *See* White Reply Br. at 12 n.3. Specifically, the brief inexplicably describes remarks made by "practicing prosecutors and criminal defense attorneys" after the trial. *Id.* As White's counsel surely knows, a party may not—apropos of nothing—cite private conversations with members of the bar to support a claim that the judge violated her client's right to due process. *See* Fed. R. App. P. 10(a), 28(e). Needless to say, we disregard any facts not contained in the record.

Third, White accuses the judge of being "dismissive and undignified" during one interaction after the judge excused the jury for the day. White Br. at 40. The exchange occurred after White's counsel objected to two leading questions during the government's direct examination. During the first objection, White's counsel said that the prosecutor was "spoon-feeding" testimony to the witness. Trial Tr. Vol. IV, R.713 at PageID 7444. At sidebar, the judge informed White's counsel that her "attitude" was "inappropriate for court." *Id.* A few moments later, White's counsel objected to another leading question; after the prosecutor agreed to rephrase the question, White's counsel said, "I mean, Judge, please." *Id.* at PageID 7458. The jury was excused shortly thereafter, but before dismissing the parties, the judge "want[ed] to address some of the issues . . . regarding leading questions." *Id.* at PageID 7463. The judge reminded the government of its obligation to ask non-leading questions before addressing White's counsel:

> [Y]ou cannot express exasperation with the Court ever, and especially in front of the jury. I advised you at sidebar. You continued to do it in the presence of the jury by saying "please, Judge" in an exasperated way. I'm not going to advise you of this again. You cannot do that. It is inappropriate, it is not appropriate, professional conduct, and you will be fined a hundred dollars if you do it again. Is that clear?

*Id.* at PageID 7464. White's counsel explained that she sounded exasperated because she felt bullied by the judge. The judge responded:

> So you are completely wrong in everything that you have said. I have no intention of bullying you. I have tried to admonish you on occasion when you have done things that are inappropriate, and that is what I will do, and I will do it to both sides, just as I did to [the prosecutor] a minute ago about his leading questions. . . . And so everything that you have just said that impugn my impartiality, all of it is incorrect. I'm sorry that's your impression. That's not what the record will reflect however.

*Id.* at PageID 7465–66. Even if we accept White's claim that these comments are not "ordinary admonishments," they are certainly not "so extreme as to display clear inability to render fair judgment." *Alemarah v. Gen. Motors, LLC*, 980 F.3d 1083, 1087 (6th Cir. 2020) (per curiam) (quoting *Liteky*, 510 U.S. at 551, 556).

21

Fourth, White suggests that the judge's treatment of her counsel suggested to the jury "that [her] case is not worthy." White Br. at 44. But in addressing White's counsel's exasperation, the judge made clear that he had "no opinion whatsoever about the evidence in this case." Trial Tr. Vol. IV, R.713 at PageID 7465–66. He added that "Ms. White is entitled to a fair trial," he "wanted her to have a fair trial," and he thought "she [was] having a fair trial." *Id.* at PageID 7466. And, as noted above, almost all of the exchanges cited by White occurred outside the presence of the jury. But as an added precaution, the judge twice instructed the jury not to consider his own comments. *See United States v. Powers*, 500 F.3d 500, 514 (6th Cir. 2007) (instructing the jury to ignore the judge's comments acts "as a measure against the possible prejudice of his comments").

Put simply, the judge's periodic admonishments of White's counsel—many of which were in response to White's counsel's behavior—fall far short of "reveal[ing] such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. Thus, the judge did not err, plainly or otherwise, by failing to recuse himself.

\*\*\*

In sum, we reject all five of White's claims. Because White did not show that any of the district court's rulings were erroneous, her invocation of the cumulative error doctrine also fails. *See United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012).

**III.**

Instead of disputing specific rulings by the district court, Herndon takes a more succinct approach: he argues that there was insufficient evidence to support his conviction. But the district court rejected this claim twice, and we do the same here.

We review Herndon's challenge to the sufficiency of the evidence de novo. *United States v. Fox*, 134 F.4th 348, 366 (6th Cir. 2025) (per curiam). We must "determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Mathis*, 738 F.3d 719, 735 (6th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In other words, we will not reverse a conviction based on insufficient evidence unless, "viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *Fox*, 134 F.4th at 366 (quoting *United States v. Wright*, 774 F.3d 1085, 1088 (6th Cir. 2014)). The defendant carries a heavy burden, as we recognize a "strong presumption in favor of sustaining a jury conviction." *United States v. Johnson*, 79 F.4th 684, 711 (6th Cir. 2023) (citation omitted). In our review, "we may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005).

The jury convicted Herndon of conspiracy to commit money laundering. *See* 18 U.S.C. § 1956(h). To prove that Herndon participated in a money laundering conspiracy, the government had to show "that two or more persons conspired to commit the crime of money laundering," and Herndon "knowingly and voluntarily joined the conspiracy. *United States v. Powell*, 847 F.3d 760, 781 (6th Cir. 2017) (citation omitted). On appeal, Herndon does not contest that McCoy led the Money Gang Meal Clique. Nor does he dispute that White and McCoy conspired to launder drug proceeds. Instead, he claims the government failed to prove that (1) he *knew* McCoy was the leader of a drug-trafficking organization, and (2) he *knowingly* joined the conspiracy. Neither claim is persuasive.

First, the government presented sufficient evidence that Herndon knew about the illicit source of McCoy's income. Herndon cannot avoid conviction "merely by deliberately closing his eyes to the obvious risk that [McCoy] engag[ed] in unlawful conduct." *United States v. Geisen*, 612 F.3d 471, 485–86 (6th Cir. 2010) (quoting *United States v. Gullett*, 713 F.2d 1203, 1212 (6th Cir. 1983)). Instead, the government may rely on evidence that Herndon was "deliberately ignorant" of where McCoy's money came from. *United States v. Henderson*, 824 F. App'x 325, 331 (6th Cir. 2020); *see also United States v. Mitchell*, 681 F.3d 867, 877 (6th Cir. 2012) ("Deliberate avoidance is not a standard less than knowledge; it is simply another way that knowledge may be proven." (citation omitted)). In other words, Herndon had sufficient knowledge if he was "aware of a high probability" that McCoy's income was criminally derived. *Geisen*, 612

F.3d at 486 (citation omitted); *see United States v. Hill*, 167 F.3d 1055, 1067 (6th Cir. 1999) (noting that the "knowing" scienter requirement in 18 U.S.C. § 1956 "include[s] instances of 'wilful blindness'").

Herndon essentially admitted that he deliberately ignored the source of McCoy's income. During his interview with law-enforcement officers, Herndon explained that McCoy gave him $100,000 in cash for the down payment of the house. When asked about how McCoy obtained the cash, Herndon responded that "he did not want to know where the money was from." Trial Tr. Vol. IX, R.741 at PageID 8097. As the district court rhetorically asked, "if [the money] was from some other type of legitimate business, why would you not want to know[?]" Mot. for J. of Acquittal Hr'g Tr., R.905 at PageID 14285.

In addition to Herndon's admission, the government also presented evidence that (1) Herndon initially lied to investigators about the source of the money used for the down payment; (2) Herndon flew to Baltimore to pick up $10,000 in cash from a member of the drug-trafficking organization; and (3) all but three of the cash deposits used to purchase the home were under $10,000. This evidence, while circumstantial, was enough to permit the "reasonable inference[]" that Herndon deliberately ignored McCoy's illegal activities. *United States v. Acosta*, 924 F.3d 288, 296–97 (6th Cir. 2019).

Second, there is sufficient evidence that Herndon joined the money laundering conspiracy. The government did not need to "prove the existence of a formal agreement" between Herndon, White, and McCoy, as "evidence of a tacit agreement or mutual understanding is sufficient[.]" *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998) (citation omitted). At trial, the jury heard evidence that Herndon acted on McCoy's behalf: Herndon offered to buy the house for McCoy, McCoy gave Herndon $100,000 in cash for the down payment, McCoy sent Herndon to Baltimore to collect $10,000, and Herndon's ex-girlfriend paid off the hard-money loan for the house. There was also evidence of White's involvement: she told the realtor that Herndon would obtain financing for the house, and she kept a note on her phone listing the payoff amounts for the

hard-money loan. In short, there was "overwhelming" evidence that Herndon was "acting in concert" with White and McCoy. Mot. for J. of Acquittal Hr'g Tr., R.905 at PageID 14286.

Notwithstanding this evidence, Herndon claims that his conviction cannot stand because he offered "a reasonable and legal basis" for the numerous cash deposits spread across several bank accounts. Herndon Br. at 10. But the government's circumstantial evidence need not "remove every reasonable hypothesis except that of guilt." *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) (citation omitted). So even if Herndon provided a plausible explanation for his banking activity, the jury "could have made a reasonable inference" that the myriad cash deposits under $10,000 and the winding flow of bank transfers confluencing in an account he controlled was "not consistent with normal business practices." Mot. for J. of Acquittal Hr'g Tr., R.905 at PageID 14273. Because we are in no position to "reweigh the evidence," we decline to second-guess the jury's verdict. *Martinez*, 430 F.3d at 330.

## IV.

We **AFFIRM** the district court's judgments.